[No. 13786. Department One. May 11, 1917.]

# THE STATE OF WASHINGTON, *Respondent*, v. CHARLES A. MEYER, *Appellant*.[1]

HOMICIDE—SELF-DEFENSE—INSTRUCTIONS—DUTY TO RETREAT—IS-SUES. Where the deceased, feloniously assailing the accused in a public road, was only fifteen or twenty feet away, pointing a pistol directly at accused and threatening to take his life, there obviously was no opportunity to retreat, and it is error to instruct upon the duty of the accused to retreat if possible without increasing his own danger; since the accused had the right to stand his ground and take life, if in good reason apparently necessary to preserve his own life or protect himself from bodily harm.

SAME — DEFENSE OF ANOTHER — STATUTES. Rem. & Bal. Code, § 2406, providing that the homicide is justifiable when committed in the lawful defense of another person is but declaratory of the common law.

SAME — DEFENSE OF ANOTHER — ASSISTING AGGRESSOR — SELF-DE-FENSE—INSTRUCTIONS. Where the accused went to the defense of his attendant at a dance, shooting her assailant in the legs to save her life, the assailant's father had no right to come to the defense of his son and advance upon the accused with a pistol threatening his life, and in doing so he becomes the assailant, who may, if neces-sary, be killed in self-defense; and an instruction upon the essential element of self-defense should omit the necessity to retreat where there was obviously no opportunity to retreat.

SAME—SELF-DEFENSE—AGGRESSOR—EVIDENCE—THREATS— ADMISSI-BILITY. Upon an issue as to who was the aggressor and whether the accused had reason to believe that he and his companion were in imminent danger of losing life or suffering great bodily harm, it is error to exclude evidence of a threat, made by one of the assailants immediately before, that he would go home and get his father and "clean out the whole God damn bunch" which threat was immediate-ly executed by the return of the two and a joint attack upon mem-bers of the party, in which the father lost his life.

SAME—SELF-DEFENSE—EVIDENCE—PRIOR HOSTILITY—MATERIALITY. Where the accused, in defending his companion from a felonious as-sault, wounded one of the assailants, and killed the other in self-de-fense when the attack was turned upon him, in a prosecution for the homicide, evidence of a prior difficulty and hostile feeling be-tween the accused and the wounded assailant is inadmissible as im-material.

[1]Reported in 164 Pac. 926.

9—96 WASH.

Appeal from a judgment of the superior court for Clarke county, Back, J., entered June 1, 1916, upon a trial and conviction of murder in the second degree. Reversed.

*J. L. Sutherland,* for appellant.

*Jas. O. Blair,* for respondent.

WEBSTER, J.—The defendant, Charles A. Meyer, was charged with the murder of John Kramer. He was convicted of murder in the second degree, and sentenced to imprisonment in the state penitentiary for a period of not less than ten years nor more than twenty years. From this judgment, he appeals.

There is little if any conflict in the testimony as to the following facts: On the evening of December 25, 1915, the defendant, in company with Lillian Abbott, his housekeeper, attended a Christmas party which was given at the residence of Peter Kramer, at Hazel Dell Corners, a village about four miles north of the city of Vancouver. Peter Kramer and his wife were away from home, and the party was arranged and given by their son Mat Kramer. The invited guests were Pauline Ecklund, Grace Goff, Lillian Abbott, Ray Holtgrieve, Ed. Kramer, Jr., John Meyer, Peter Zens and the defendant. A keg of beer and several bottles of whiskey had been provided by Mat Kramer, and all of the members of the party drank more or less of these liquors. The defendant and Lillian Abbott arrived at the Peter Kramer residence about seven-thirty in the evening. Edward Kramer, Sr., a son of the deceased, John Kramer, and a cousin of Mat Kramer, attended the party uninvited. He was about forty-five years of age and lived at the home of his father, which was about two hundred and fifty feet south of the Peter Kramer house and on the opposite side of the road or street. Very soon after the arrival of the defendant and Lillian Abbott, Edward Kramer, Sr., undertook to take indecent liberties with the person of Lillian Abbott. He also had some trouble with his son, Edward Kramer, Jr. During the evening he made himself

generally disagreeable and offensive. In order to prevent further trouble, Mat Kramer requested him to either conduct himself properly or leave the house. After some words between them, he left, cursing and vilifying the members of the party, both male and female, and made the threat, "I will get all of you sons of bitches before morning."

Immediately upon his leaving the house, the members of the party decided that it would be advisable for them to go home, and thus avoid Kramer in the event he should return to carry out his threat. They immediately commenced to put on their wraps, and were in the act of leaving the house when Edward Kramer, Sr., and his father, John Kramer, appeared at the front gate leading to the Peter Kramer residence. Both Edward and John Kramer indulged in vile and profane language, called the members of the party vulgar and offensive names, and threatened that, if the party did not come out of the house, they would go in and get them. Whereupon several members of the party went to the gate, apparently for the purpose of quieting the Kramers. Some of them remained inside the yard, while others, including Mat Kramer, Edward Kramer, Jr., Lillian Abbott, Peter Zens and the defendant, went out into the road. A number of the witnesses testified that Edward Kramer, Sr., was armed with a knife and a club, and John Kramer was armed with a pistol and a club. John Kramer immediately took Mat Kramer to task for the character of the party he was giving in the absence of his parents, referring to it in an obscene and filthy manner. He also threatened to knock Mat Kramer's head off, but Mat backed through the gate into the yard. Edward Kramer, Sr., then attempted to assault his son, Edward Kramer, Jr., who, in order to get away from his father, ran down the road and jumped over the fence into the Peter Kramer yard. Edward Kramer, Sr., then attacked the defendant, who backed away from him until he reached the fence. There Kramer assaulted him with a knife and inflicted upon him three wounds, one of which was in the left breast over the heart, and was about

five or six inches in length and from one-fourth to one-half an inch deep. The defendant finally succeeded in getting away from Kramer and went back into the yard. Kramer then assaulted Lillian Abbott, called her vile and insulting names, threatened to cut her heart out, and was roughly pushing her in front of him down the road in the direction of the John Kramer residence. She was screaming and calling for help. At this point the defendant requested Edward Kramer, Jr., and other members of the party to go with him to the assistance of Lillian Abbott. This they declined to do, one of them saying that Edward Kramer, Sr., and John Kramer were armed. The defendant then asked Mat Kramer whether there was a weapon in the house. He was told that there was a shotgun in the wash room. He went in, procured the gun, but finding no shells, went back and asked Mat Kramer where the shells were kept. He was told that they were on the kitchen cabinet. The defendant returned to the house, found the shells, and loaded the shotgun. During this time Edward Kramer, Sr., was continuing his assault upon Lillian Abbott, and she was calling to the defendant to come to her rescue. After loading the gun, the defendant hurried out of the house and went down the road to the place where Edward Kramer and Lillian Abbott were. When he got near Edward Kramer he said: "Ed, you cut that out," and Kramer turned as if to assault him, but seeing the shotgun in defendant's hands, immediately turned toward Lillian Abbott, called her a vile name, and said: "I will cut the heart out of you." He was in the act of striking her, as the defendant believed, with a knife which he held in his hand. She screamed and the defendant shot Kramer in the legs, most of the charge taking effect on the inside of the left leg a few inches above the ankle, and a few of the shot lodging in the outside of the right leg at about the same distance from the ankle. At this instant, according to the testimony of the defendant and Peter Zens, an eyewitness to the shooting, and which was strongly corroborated by

other evidence, John Kramer advanced upon the defendant with a pistol pointed at him and said either "I will shoot you, Charlie Meyer," or "I will get you, Charlie Meyer." At this time the defendant was holding the shotgun at his right hip. Without taking time to raise the gun to his shoulder, he fired the second shot, killing John Kramer instantly. According to all of the testimony, the time elapsing between the shots was but a few seconds. After the shooting, it was found that Lillian Abbott had been roughly treated by Kramer, her hair was disheveled and her clothes were badly torn. A few minutes after the shooting, the defendant, in company with members of the party, went to a nearby house and the sheriff was notified by telephone of the killing. The defendant remained at the house until officers arrived, and surrendered himself to their custody.

The theory of the defense was that Edward Kramer, Sr., left the Peter Kramer residence, went to his home and got his father, and that the two were acting in concert when they appeared at the gate leading to the Peter Kramer house; that they went there for the purpose of attacking members of the party and causing serious trouble; that Edward Kramer, Sr., after attacking other members of the party, including the defendant, was making a felonious assault upon Lillian Abbott without fault on her part; that the defendant went to her defense and, while Kramer was apparently in the act of inflicting upon her great bodily harm or attempting to take her life, the defendant, using no more force than reasonably appeared to be necessary to protect her from the then impending danger, shot Edward Kramer in the legs with the shotgun; that this occurred upon the public highway where the defendant had a lawful right to be; that, immediately upon his firing the shot which wounded Edward Kramer, John Kramer advanced upon him with a pistol in his hand threatening to take his life, and that the defendant then, acting in his own necessary self-defense, fired the second shot, which resulted in the death of John Kramer.

In instructing the jury upon the law of the case, the court charged in part as follows:

"Before a person can take the life of an assailant he must be in a position where he cannot retreat without increasing danger to his life or subjecting himself to great bodily harm, and if he can retreat without so increasing his danger to life or great bodily harm, he cannot successfully invoke the doctrine of self-defense."

The giving of this instruction is assigned as error. Counsel for defendant insists that, under the evidence in the case, there was no room for an instruction upon the doctrine of retreat, for two reasons: first, because the deceased, at the time of the shooting, was advancing upon the defendant with a pistol in his hand threatening to take the defendant's life, and that, in these circumstances, the defendant was compelled to act instantly and had no opportunity to retreat; and second, that if the jury should find that, without fault on the part of Lillian Abbott, Edward Kramer, Sr., was making a felonious assault upon her in the public highway, that the defendant had the lawful right to go to her assistance, and, if in her necessary defense he shot and wounded Edward Kramer, he was within his rights and was guilty of no violation or infraction of the law; that, being in a place where he had the right to be and doing that which, under the law, he had the right to do, if he was then and there feloniously attacked by John Kramer, he was not required to retreat, but was entitled to stand his ground and repel force with force, even to taking the life of his assailant, if in good reason it was apparently necessary to do so for the preservation of his own life or to protect himself from great bodily harm at the hands of the deceased.

We consider both contentions to be meritorious. The instruction complained of was abstract and wholly inapplicable to the facts established by the evidence. Obviously, under the testimony, the defendant had no opportunity to retreat. It is too well settled to justify lengthy discussion that, where

retreat from an assault is impossible without increasing the peril of the one assaulted, he may stand his ground; that is to say, where an assault is so fierce and imminent that the person assaulted honestly believes, and has good reason to believe, that he cannot retreat without manifestly increasing the danger to himself, he is not required to retreat, and if in standing his ground and defending himself he kills his assailant, he is justified. The instruction, therefore, that the defendant was required to retreat if he could do so without increasing the hazard to himself was erroneous, misleading and confusing.

In *State v. Phillips*, 59 Wash. 252, 109 Pac. 1047, Judge Rudkin said:

"The party first assaulted, whether the appellant or the deceased, was clearly acting in self-defense. There was neither time nor room for retreat or warning, and an instruction upon that question could only tend to mislead or confuse the jury. It is said that this instruction was copied almost literally from an instruction approved by this court in *State v. Stockhammer*, 34 Wash. 262, 75 Pac. 810. This is true, but an instruction which is correct in the abstract, or correct as applied to one state of facts, may be very misleading when applied to another and different state of facts. When the court instructed the jury that a person against whom a murderous, felonious assault is committed with a deadly weapon must retreat or give warning, before taking the life of his assailant in self-defense, it imposed upon him a burden which the law does not sanction, and the fact that the instruction was qualified by the proviso, if he has time to retreat or give such warning, does not necessarily render the instruction harmless. In other words, instructions covering every possible phase of the law of self-defense should not be given in any case unless called for by the testimony, as abstract rules of law not applicable to the facts of a given case are sometimes as misleading as incorrect rules. So much of the law of self-defense as is applicable to the facts before the court should be given in plain and concise language, but rules of law applicable to other and different facts should be withheld from the jury."

To instruct a jury that, where the assailant is approaching the accused with a pistol pointed directly at him and threatening to take his life, and the parties at the time are only fifteen or twenty feet apart, the accused must retreat to the wall if he can do so without increasing the danger to himself, is submitting to the jury an impossible issue and imposing upon the accused a burden which the law never intended that he should bear. Upon the other hand, the ancient doctrine of the common law, that the right of self-defense did not arise until every effort to escape had been resorted to, even to the point of retreating until an impassable barrier was reached, has been supplanted in many of the American states, including the state of Washington, by the more reasonable doctrine and the one more in keeping with the dictates of human nature, to the effect that, when one is feloniously assaulted in a place where he has the right to be and is placed in danger, either real or apparent, of losing his life or of suffering great bodily harm at the hands of his assailant, he is not required to retreat or to endeavor to escape, but may stand his ground and repel force with force, even to taking the life of his assailant if necessary, or in good reason apparently necessary, for the preservation of his own life or to protect himself from great bodily harm. *State v. Cushing,* 14 Wash. 527, 45 Pac. 145, 53 Am. St. 883; *State v. Carter,* 15 Wash. 121, 45 Pac. 745; *State v. McCann,* 16 Wash. 249, 47 Pac. 443, 49 Pac. 216; *State v. Phillips, supra; State v. Bowinkelman,* 66 Wash. 396, 119 Pac. 824; *State v. Gardner,* 96 Minn. 318, 104 N. W. 971, 2 L. R. A. (N. S.) 49.

That the defendant had the right, under the law, to go to the defense of Lillian Abbott, if she was being feloniously assaulted, and to do such things for her protection as she might have done for herself had she been able, there can be no serious question. Rem. & Bal. Code, § 2406, provides:

"Homicide is also justifiable when committed . . . in the lawful defense of the slayer, or his or her husband, wife, parent, child, brother or sister, or of any other person in his

presence or company, when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony or to do some great personal injury to the slayer or to any such person, and there is imminent danger of such design being accomplished."

This is but a statutory declaration of the common law. In Michie on Homicide, vol. 1, § 122, the rule is stated in this language:

"One may kill to protect another from death or serious bodily injury, real or apparent, and may be justified. The same circumstances that will justify or excuse the homicide where the assault is upon one's self will also excuse or justify the slayer if the killing is done in defense of such person's husband, wife, parent, child, brother, sister, nephew, master, servant, guardian, or ward, or of a stranger where an unlawful and violent attack is made upon him."

See, also, *State v. Tribett*, 74 Wash. 125, 132 Pac. 875; *State v. Hennessy*, 29 Nev. 320, 90 Pac. 221; 21 Cyc. 826.

If the defendant, at the time he shot and wounded Edward Kramer, Sr., was acting in the reasonable and necessary defense of Lillian Abbott, the deceased, John Kramer, had no right to go to the defense of his son. In *State v. Tribett, supra,* the trial court instructed the jury as follows:

"The same conditions which will authorize a man to act in defense of himself will authorize him to act in defense of his son. If the father, seeing his son assaulted or menaced with great danger to life, under circumstances such as are calculated to create in the mind of the father a well-grounded belief that the son is in danger of some great personal injury, then such father, if he actually and in good faith believes the life of such son to be in danger, has the right to use such force as may at the time under all the circumstances reasonably seem necessary to prevent the threatened danger to his son."

In commenting upon this instruction, Judge Gose said:

"This instruction should have been qualified by an instruction that, if the son was himself the aggressor, then the right of the father to act in his defense remained in abeyance until the son had in good faith attempted to withdraw from the

conflict which he had brought on. This qualification springs from the principle that one who is himself the aggressor may not invoke the law of self-defense until he has in good faith attempted to withdraw from the combat, and one who goes to the defense of another stands in the shoes of him he seeks to defend."

Consequently, if Edward Kramer, Sr., was making a felonious assault on Lillian Abbott and the defendant was acting in her defense, the deceased did not have the right to advance upon him with a pistol pointed at him. But the defendant had the right, under those conditions, to act in his own defense, and in doing so he was not required to retreat, but had the right to stand his ground and repel force with force, even to the taking of life, if, in the light of the attending circumstances, this was apparently necessary to save his own life or to protect himself from great bodily harm at the hands of the deceased. The court should have so instructed the jury.

It is also assigned that the court erred in giving the following instruction:

"The defendant contends that the killing of John Kramer was excusable and justifiable because done in self-defense. The essential elements of self-defense are these: first, the defendant must be free from fault; that is he must not say or do anything for the purpose of provoking a difficulty, nor must he be disregardful of the consequences in this respect of any wrongful word or act. Second, there must be a present impending peril to life or of great bodily harm, either real or apparent, as to create the *bona fide* belief of an existing necessity. Third, there must be no convenient or reasonable mode of escape by retreat or declining the combat."

The third element in this instruction should not have been included in the charge to the jury, for the reasons already pointed out.

At the trial the defendant called, as a witness in his own behalf, Edward Kramer, Jr., and he was asked the following questions and made the following answers:

"Q. Do you know when your father left the house? A.
Yes, sir. Q. Do you know what he said when he left? A. He
said he would go home and get the old man and clean out the
whole God damn bunch."

Counsel for the state moved that this testimony be stricken.
The motion was granted and the jury was instructed to disre-
gard the evidence and not to consider it for any purpose.
This ruling is assigned as error. The question, "Do you
know when your father left the house?" referred to Edward
Kramer, Sr.'s, leaving after he had been told by Mat Kramer
that he must conduct himself properly or leave. As we have
already said, the record discloses that, within a very few min-
utes after Edward Kramer, Sr., left the Peter Kramer home,
he and his father appeared at the yard gate leading to the
house. At this time they were both armed, were calling mem-
bers of the party vile names, and were making violent threats
against them. The threat of Edward Kramer to go get the
old man and clean out the whole bunch was to this extent exe-
cuted. The previous threat, accompanied by the subsequent
conduct of the parties in carrying it out, reasonably war-
ranted the inference that Edward Kramer, Sr., and John
Kramer were acting in concert in the execution of an unlawful
purpose, in which event the act or declaration of either in
furtherance of the unlawful enterprise was the act or declara-
tion of the other, and this is so whether the act or declaration
was done or made prior to the time that John Kramer became
a party to the unlawful undertaking or not. The evidence
was competent as tending to show that John Kramer was the
aggressor in the immediate difficulty in which he lost his life.
It would tend strongly to corroborate the defendant's version
of the transaction that John Kramer was the attacking party,
and was advancing upon the defendant with his pistol pointed
at him at the time the second shot was fired. If the threat was
made in the hearing of the defendant or was communicated to
him prior to the shooting, it was competent as tending to shed
light upon the question of whether the defendant believed,

and had reasonable ground to believe, that he was in imminent danger of losing his life or suffering great bodily harm at the hands of John Kramer at the time the defendant shot and killed him. And it was also competent as casting light upon the question of whether the defendant had reasonable ground to believe, and in good faith did believe, that Lillian Abbott was in danger of losing her life or of suffering great bodily harm at the hands of Edward Kramer, Sr., when he went to her defense, she being one of the members of the party against which the threat was made. The threat having been made by Edward Kramer and executed as it was by him and John Kramer, was an important circumstance and should have been permitted to go to the jury, in connection with all the other facts and circumstances shown by the evidence, for the purpose of enabling the jury to place itself in the position of the defendant at the time of the shooting and, from his viewpoint, determine the reasonableness of his conduct.

It is next assigned that the court erred in holding that counsel for defendant was not entitled to state to the jury that a difficulty had occurred between Edward Kramer, Sr., and the defendant about four years prior to the shooting, and that, on account of this trouble, Edward Kramer, Sr., had a hostile feeling toward the defendant. And also that the court erred in refusing to admit evidence to this effect. This contention is without merit. The defendant was not charged with having killed or injured Edward Kramer, Sr. Nor did he claim that he shot Edward Kramer, Sr., in defense of himself. As we have already stated, the defendant's theory was that, at the time he shot Edward Kramer, Sr., he was acting in the defense of Lillian Abbott. Consequently the hostile feeling of Edward Kramer, Sr., toward the defendant personally was wholly immaterial.

Upon the retrial of the cause, the court, by appropriate instruction, should submit to the jury the defendant's theory of the case, viz., that, at the time he shot Edward Kramer, Sr., he was acting in the reasonable and necessary defense of

Lillian Abbott, and that the deceased, John Kramer, did not have the right to go to the defense of his son, Edward Kramer, Sr., but that his rights in this respect were measured by the rights of the son; that the deceased, at the time the defendant shot and killed him, was making a felonious assault upon the defendant, and consequently the defendant was not required to retreat, but had the right to stand his ground and repel force with force, even to taking the life of his assailant, if, in the light of the attending circumstances and surroundings, he had reasonable ground to believe, and in good faith did believe, that he was then and there in danger of losing his life or of suffering great bodily harm at the hands of the deceased. There is evidence in the record more or less circumstantial and negative in character, which militates against the defendant's version of the unfortunate occurrence, but nevertheless he is entitled to have his theory of the case submitted to the jury, there being abundant evidence in support of it.

The judgment is reversed, and the cause remanded for a new trial.

ELLIS, C. J., MORRIS, MAIN, and CHADWICK, JJ., concur.