[No. 26111.  *En Banc.*  August 10, 1936.]

THE STATE OF WASHINGTON, *Respondent,* v. H. H.
HIATT *et al., Appellants.*[1]

[1]Reported in 60 P. (2d) 71.

*Guy E. Kelly* and *Patterson & Ross,* for appellant Marinoff.

*Borberg & McGough,* for appellant Hiatt.

*Harry H. Johnston, Stuart H. Elliott,* and *John W. Fishburne,* for respondent.

Tolman, J.—The appellants Marinoff and Hiatt were charged, together with Oscar Wold, J. L. Hanford and Theo Fergeson, with the crime of murder in the first degree. Marinoff was charged as an accessory before the fact and the others as direct participants.

A trial was had to a jury. At the close of the state's case, the prosecutor acquiesced in a directed verdict of not guilty as to the defendant Wold. The case as to the other defendants was submitted to the jury, resulting in a verdict finding each of the four guilty of manslaughter. The defendant Fergeson, who admittedly fired the fatal shot, was given a jail sentence of one year, with credit thereon for time spent in jail awaiting trial. The defendant Hanford was sentenced to one year in jail, and the sentence was suspended. The defendants Marinoff and Hiatt were each given a sen-

228

tence of twenty years in the penitentiary, and each has appealed.

A somewhat general outline of the facts must precede a discussion of such of the errors assigned as appear to be vital. On May 24, 1935, the date charged in the information, Peter Marinoff was, and for some time had been, the president and general manager of the Northwest Brewing Company, a Washington corporation, having a plant in the city of Tacoma; and at that time, and for some days, at least, preceding, there had existed a controversy between the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America on the one hand and the Brewery Workers Union on the other. The teamsters' union had declared a strike against the Northwest Brewing Company and was engaged in picketing the Tacoma plant of that company.

Armed guards had been provided for the protection of the brewing plant and the protection of the trucks of the brewing company while engaged in making deliveries. The defendants Hiatt, Wold, Hanford and Fergeson were such guards so employed. There is a controversy as to whether the guards were employed and paid by the Brewery Workers Union or by Marinoff as the managing officer of the brewing company. We shall assume, for present purposes, that the jury found that Marinoff was responsible for the employment and arming of the guards.

In the late afternoon of May 24, 1935, the day of the shooting, it became necessary or advisable to take one of the trucks of the brewing company from the brewing plant to a garage, two or three blocks away, to have a tire changed. At this time, as all during the strike, the teamsters union was closely picketing the brewery and causing each truck leaving the plant to be followed. When, on this occasion, the truck left the

brewery for repairs, appellant Hiatt, in an automobile, closely followed the truck to the garage where the work was to be done. Upon arrival there, members of the teamsters union, probably pickets and observers, gathered around Mr. Hiatt and endeavored to persuade him to give up his employment as a guard, promising him safe conduct back to Seattle if he would do so, which Hiatt refused to do.

While Hiatt was engaged in controversy with these pickets, the cap was removed from the gasoline tank on his automobile and sugar was put into the tank without his knowledge. Upon returning to the brewery with the truck, some one, unidentified, telephoned the brewery and gave information of the fact that sugar had been placed in the gasoline tank of the car driven by Mr. Hiatt. Mr. Hiatt, accompanied by Hanford and Fergeson, then drove his automobile to another garage for the purpose of having the sugar removed from the gasoline tank. When they left the brewery for this purpose, they were closely followed by a car driven by Usatalo, the man who was later killed, accompanied by four others.

While the gasoline tank was being removed from Hiatt's car and flushed out, a proceeding which took some time, Mr. Usatalo remained in his car stationed across the street, with his companions, awaiting movement upon the part of Mr. Hiatt and his car. When Hiatt and his companions left the garage in the Hiatt car, the Usatalo car, occupied as before, closely followed them up through the business section of the city of Tacoma and beyond. Finally, Hiatt stopped his car, and thereupon the Usatalo car was stopped right behind it. Hiatt and his two companions, defendants Hanford and Fergeson, stepped out of the car, went back to the Usatalo car, strenuously objected to being followed, and Hiatt then said to Usatalo and his com-

panions that, if they did not cease to follow, they would have their heads blown off, or words to that effect. Notwithstanding this threat, when the Hiatt car proceeded, the Usatalo car continued to follow for a considerable distance until, by turning and zigzagging and turning off its lights, the Hiatt car finally eluded those who followed it.

After escaping from the following car, the Hiatt car was driven to the residence of Mr. Wold, where he was picked up, according to previous directions, and being advised by Mr. Wold that another brewery guard was surrounded or "treed" near the Milwaukee depot, Hiatt, with his four companions, proceeded in the car to his relief. On arrival at the place indicated, they found no one surrounded or in trouble and then started back from the Milwaukee depot toward the brewery. As they were so proceeding, the car driven by Usatalo again fell in behind them and continued to follow them as they proceeded.

When the Hiatt car turned off of Pacific avenue on to east Twenty-sixth street, it was, according to the testimony of its occupants, struck by missiles, thrown by hand, by persons there assembled, and the glass windows on the left-hand side of the car were struck and broken. Wold was hit and cut by broken glass. Shots were then fired. The jury could well find that all of the shots fired came from the men in the Hiatt car. Hanford, who sat in the front seat of the Hiatt car beside Hiatt, the driver, seems to admit that he fired a rifle at least once involuntarily and at random. There is some testimony to the effect that Hiatt stepped out of his car with a rifle and fired several shots at pedestrians moving on Pacific avenue, but there is nothing to indicate that he fired in the direction of the car driven by Usatalo or that he fired any shot at random.

Fergeson, armed with a 38 caliber revolver, seems to have fired two or three shots therefrom, perhaps at the moving pedestrians, but certainly in a direction away from the Usatalo car, and then to have turned and through the back window of the Hiatt car, the glass from which had been theretofore removed, extending his arm well out, he fired directly at the Usatalo car, which was some sixty to eighty feet distant. The ball from his revolver struck Usatalo squarely in the middle of the forehead and inflicted the wound from which he died. Following this shooting, Hiatt turned his car around and sped away from the scene.

In order to support the theory that Marinoff was an accessory before the fact, four witnesses were produced who testified that, on May 22, 1935, between eleven o'clock and noon, or about sixty hours before the killing, Marinoff was at the plant of the brewing company when a truck was being moved in or out, which was immediately surrounded by a considerable gathering of pickets, or strikers, the number being estimated variously from ten or twelve up to possibly one hundred. At that time, according to the testimony, Marinoff put his head out of his office window and shouted words to the effect that he would pay five hundred dollars to any one who would "get" any one of the pickets there assembled, the offer being testified to in various terms such as "I will pay five hundred dollars to the man that gets that man," and, again "five hundred dollars to throw that bomb," "five hundred dollars for any of them guys' heads," "five hundred dollars for any of those fellows," "I will give five hundred dollars for any of those guys," at the same time pointing to all who were assembled about the truck in the street.

There is testimony to the effect that Fergeson or Hanford was present within hearing of such offers

armed with a tear gas bomb (possibly both were present); that Hiatt was present armed with a rifle, and that two truck drivers were present, both being armed. Of course, Marinoff and all those in the employ of the brewery who were present, deny that any such offer, threat or statement was made. There is testimony in the record sufficient to permit the jury to find that Marinoff was responsible for arming these guards, both with the rifles and revolvers as well as with the non-deadly tear gas bombs.

The errors upon which the appellants chiefly rely, and the ones which principally question the sufficiency of the evidence, are that the court erred in refusing to grant their motions for instructed verdicts of not guilty; and, in any event, the court erred in submitting the crime of manslaughter to the jury.

These matters which require a review of the evidence as a whole can be discussed more or less together with a saving of space; but, perhaps, as an introduction to the discussion, the crime of manslaughter should be defined, and the rule with reference to submitting the question of manslaughter to a jury as an included offense should be restated. In *State v. Palmer,* 104 Wash. 396, 176 Pac. 547, this court said:

"No longer is the intentional killing upon sudden heat, or the intentional killing, no matter how provoked, classified as manslaughter. And as soon as it appears that the killing was with a design to effect death, the element of manslaughter disappears from the case. That grade of homicide is characterized by the fact that the one guilty of it possessed no design to kill. If the purpose to kill is present, the offense must be murder in one of its degrees."

This rule has ever since been adhered to. *State v. Hoyer,* 105 Wash. 160, 177 Pac. 683; *State v. Sandvig,* 141 Wash. 542, 251 Pac. 887.

Of course, where one deliberately and intentionally fires a deadly weapon at a human being, into a crowd, or at a particular point where human beings are known to be, the law assumes that the actor intended to accomplish the natural result of his act, and if death results, the killing was intentional.

Manslaughter or unintentional killing is, in law, included in the charge of intentional killing (murder in either degree), but there must be evidence in the case from which the jury may properly find that the killing was unintentional in order to warrant a submission of the question to them. We have so held in a long line of cases from *State v. Kruger,* 60 Wash. 542, 111 Pac. 769, to *State v. Johnson,* 184 Wash. 493, 52 P. (2d) 317.

Upon the questions of law which it deems to be involved, the state seems to rely very largely upon the case of *State v. Hopkins,* 147 Wash. 198, 265 Pac. 481, 59 A. L. R. 688, where one who permitted a drunken man to drive her automobile and rode with him until, by his reckless driving, he caused the death of another, was held to be an accessory before the fact in the crime of manslaughter. Obviously, for reasons which will appear as we proceed, that case has no bearing upon the issues here presented.

Was the evidence against Marinoff sufficient to take either the question of intentional killing or unintentional killing to the jury? From the facts already stated, it clearly appears that, if Marinoff was an offender, either intentionally or unintentionally, it must be because he hired guards and armed them, or because of his so-called offer of a reward. It seems to be conceded that a bitter controversy existed between the two unions, and that the brewery was the more or less innocent victim. Its property was closely invested by pickets day and night. Every vehicle leaving its

plant was immediately and closely followed, and its business was hampered as far as might be without actual violence.

Under such conditions, it does not appear to be either unreasonable or unlawful for the managing officer of the brewery to engage and arm guards to protect the property which was in his charge from damage and loss through possible riot or unlawful violence. There was no attempt to prove that Marinoff hired as guards men who were known to him to be violent, untrustworthy, or such as were inclined to use force without provocation. Nothing is shown in this respect to indicate that Marinoff acted other than as reasonably appeared to be necessary in order to preserve and protect the property for which he was responsible.

As to the so-called offer of a reward, if Marinoff said what he is charged with saying, under the conditions indicated, he certainly acted unwisely; and if, at that time, one or more of his armed guards had acted upon his words, the law would hold him responsible. Though the guards were at hand and armed, nobody acted.

The prosecutor in his printed brief says:

"The jury could well believe, and probably did believe, from the evidence that the statements made by Marinoff were made in the heat of passion and the only influence that it might have upon the other defendants was to inflame them, and to make them more reckless when they would come into contact with the pickets. At best it would only show malice towards the teamsters, malice in the sense as that word is used and described in the case of *State v. McKay, supra.*

"That Marinoff did not intend his offer should be actually taken up or accepted by Hiatt, Fergeson, Hanford or Wold is clear, otherwise he would have been more secret about it. Certainly he would not have shouted this offer out at 11 a. m. in broad daylight in the presence of 50 people."

We quote this, not as an admission on the part of the state, but as indicating the effect of the verdict upon the trained mind of the prosecutor. Thus, it seems that, if Marinoff made the statements attributed to him, he intended thereby no more than to intimidate those who were interfering with his business, and that it would be speculation, pure and simple, for a jury to say that the words, if uttered, had any effect upon the different situation which came into existence sixty hours later, when the fatal shot was fired. We are convinced that there was no substantial evidence from which the jury could find that Marinoff aided or abetted either an intentional or an unintentional killing. His motion for a directed verdict should have been granted.

The appellant Hiatt stands in a somewhat different position. He was apparently in charge of the men who rode in the car with him. He made the threat to blow off the heads of those who were following him an hour or two before the fatal event. That threat is somewhat remote and, standing alone, might be disregarded, but it is to be considered together with all of the other circumstances. Most important is the testimony to the effect that, when the missiles struck his car, Hiatt alighted and deliberately fired a number of shots from a rifle at persons on Pacific avenue. Had one of his shots taken effect, his act could only be justified or excused on the ground of self-defense. If not so justified, the killing would have been intentional, and the offense would have been murder and not manslaughter.

If the jury found that Hiatt was in charge of the other men and himself started the shooting, we think they might also find that Hiatt's actions would be taken as an order or command by the men under his control to do likewise, and if they or one of them fired

a random shot which caused the death, both Hiatt and the man who fired the shot might be found guilty of manslaughter, but if the shot fired was not a random shot, but deliberately aimed at the Usatalo car and its occupants, then there was no room for a verdict of manslaughter. The state introduced the written statement of the man Fergeson, who fired the shot. He said:

"After our car had turned into the street that I have described and at about the same time the glass had shattered on the side of the car that Wold was sitting on, I fired three bullets from this revolver, shooting low to the best of my remembrance at this group of people on our left, and the fourth bullet I fired at the car that was in the rear of us. This car was about fifty feet behind us and was standing still. As we turned around and started back on our way to Seattle, I saw a man in the car I shot at slump over the wheel. I just got a glance at him as we went by."

A careful study of the language used by each witness who described the shooting reveals nothing which conflicts with Fergeson's statement or which indicates that the shot fired through the rear window was a random shot. We conclude that it was error to submit the question of manslaughter to the jury.

Under the decision of this court in *State v. Ash,* 68 Wash. 194, 122 Pac. 995, 39 L. R. A. (N. S.) 611, overruling *State v. Murphy,* 13 Wash. 229, 43 Pac. 44, the verdict of guilty of manslaughter is not an acquittal upon the higher degrees of homicide, and therefore the appellant Hiatt may again be tried. Therefore, it seems necessary to give attention to some of the other errors assigned for the purpose of avoiding error on a new trial.

Testimony as to the purchase of tear gas bombs and the introduction of such bombs was wholly immaterial, because none were used or offered to be

used. There was no showing that they were procured and supplied to the guards without reasonable cause or justification, and it affirmatively appeared that their effect, if used, would not be to cause death, but only temporary illness and inconvenience. The tendency of such evidence is to prejudice the jury, and it was therefore error to admit it.

In the instruction given by the court on the question of self-defense, the court embodied in proper form the elements (1) that the defendants must not have purposely provoked the encounter; (2) that there must have been a real or an apparent peril; and then added "Third, there must be no convenient or reasonable mode of escape by retreat or declining the combat." The thought was again repeated in the same instruction in these words: "Third, there must have been no other reasonable mode of escape by retreat or by avoiding the combat with safety."

We seem to be committed to the rule that one who is where he has a lawful right to be is under no obligation to retreat when attacked. *State v. Cushing,* 14 Wash. 527, 45 Pac. 145, 53 Am. St. 883; *State v. Meyer,* 96 Wash. 257, 164 Pac. 926; *State v. Hilsinger,* 167 Wash. 427, 9 P. (2d) 357.

The appellant Hiatt and those with him were on the public streets and where they had the lawful right to be at the time of the encounter. It was Hiatt's theory that he was then attacked without fault on his part. If a jury should so find the facts to be, then the law placed no duty upon him to retreat. The instruction was erroneous in this respect.

Other matters not likely to again occur upon another trial require no discussion.

The judgment is reversed.

Main, Mitchell, Blake, Beals, and Geraghty, JJ., concur.

STEINERT, J. (concurring in part and dissenting in part)—I concur with the majority with respect to the appeal of Marinoff, but I dissent with respect to the appeal of Hiatt.

The majority hold that Hiatt's action in deliberately firing shots "at persons on Pacific avenue" was sufficient to support a finding that such action constituted an order to the other men to do likewise. I am unable to agree with this conclusion. The occasion was sudden and unexpected, and the result was provoked by the parties who threw the missiles against the car in which Hiatt and his companions were riding. Fergeson, who fired the fatal shot, acted spontaneously, and I see nothing that constituted "an order" from Hiatt to him. I think that the motion for directed verdict as to Hiatt should likewise have been granted.

HOLCOMB, J. (dissenting)—From the decision of the majority and the excusatory and commendatory reasons leading thereto, I am compelled to vigorously dissent as to the discharge of appellant Marinoff. This decision invades the province of the jury more palpably than any I have known recently.

As stated in the forepart of the majority opinion, "The jury found that Marinoff was responsible for the employment and arming of the guards." As to this, there was competent, credible and ample evidence.

Rem. Rev. Stat., § 2260 [P. C. § 8695], reads:

"Every person concerned in the commission of a felony, gross misdemeanor or misdemeanor, whether he directly commits the act constituting the offense, or aids or abets in its commission, and whether present or absent; and every person who directly or indirectly counsels, encourages, hires, commands, induces or otherwise procures another to commit a felony, gross misdemeanor or misdemeanor, is a principal, and shall

be proceeded against and punished as such. The fact that the person aided, abetted, counseled, encouraged, hired, commanded, induced or procured, could not or did not entertain a criminal intent, shall not be a defense to any person aiding, abetting, counseling, encouraging, hiring, commanding, inducing or procuring him.''

Under our statute, it is now the settled law in this state that intent to cause the death of another is not an element in the crime of manslaughter. *State v. Hopkins,* 147 Wash. 198, 265 Pac. 481, 59 A. L. R. 688.

Appellants were convicted of the least form of homicide. Whenever a homicide has been proven beyond a reasonable doubt, it is presumed to be murder in the second degree, and the burden is upon the accused to reduce it to manslaughter, or justify it. *State v. Turpin,* 158 Wash. 103, 290 Pac. 824.

The testimony recited by the majority that Marinoff was the instigator and was therefore an accessory to the killing, cannot be questioned now. The jury must also have believed that Hiatt actually employed the other men, obtained the guns, or part of them, the gas-bombs, and that the gun that actually did the killing came from Marinoff's desk. I agree with the trial judge that the instigator of such a crime as the jury found Marinoff to be guilty of is far more guilty than the man who did the shooting. It is a travesty on justice to convict the tool of the instigator and let the instigator go scot free.

I concur in the result as to appellant Hiatt, because there was error in the instruction as to the law of self-defense. However, both appellant Hiatt and appellant Marinoff should be obliged to undergo a new trial upon the same issues.

For the foregoing reasons, I dissent.

MILLARD, C. J., concurs with HOLCOMB, J.