[No. 43259-1-I.   Division One.   July 17, 2000.]

THE STATE OF WASHINGTON, *Respondent*, v. ARMON LEPAGE
IRONS, *Appellant*.

*Catherine E. Glinski* and *James R. Dixon* (of *Nielsen, Broman & Associates, P.L.L.C.*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Andrew J. Ries, Deputy*, for respondent.

KENNEDY, J. — A self-defense instruction that requires the jury to find that the defendant reasonably believed that *the victim* (rather than *the victim and those whom the defendant reasonably believed were acting in concert with the victim*) intended to inflict death or great personal injury precludes the jury from considering the defendant's right to act upon reasonable appearances in a multiple assailant attack, thereby failing to make the relevant legal standard manifestly apparent to the average juror. The trial court in this case erred by giving such an instruction and the error was not harmless. Accordingly, we reverse Armon LePage Irons's first degree manslaughter conviction and remand for a new trial.[1]

## FACTS

On November 15, 1997, around 9 p.m., Mike Jenkins, Daniel Clay, Raul Medina, Teddy Morris, and Ed Olson purchased 22-ounce bottles of malt liquor for each of them and then pulled their car into a QFC parking lot. Morris got out of the car to use a pay telephone to arrange a marijuana purchase. The others waited in the car, drinking their beers. Morris, Medina, and Olson were former members of the Northwest Crips Posse gang. Jenkins was a former member of the Black Gangster Disciples gang. Armon LePage Irons and his friend, Chris Townsend, walked through the same QFC parking lot. Irons and Townsend were both members of the Native Son Bloods gang. The Native Son Bloods and the Northwest Crips Posse were rival gangs. A week earlier, Olson had been attacked and robbed of his beer by members of the Native Son Bloods

---

[1] This ruling makes it unnecessary that we address the remaining contentions raised on appeal by appellant's appointed counsel and by the appellant in his pro se supplemental brief.

gang, and he believed that Irons and Townsend were two of the people who had attacked him. He had told his friends about the incident earlier in the evening. Medina spotted Irons and Townsend, and challenged Olson to confront them. Olson refused. Medina got out of the car and, holding his beer bottle aloft, confronted Irons and Townsend. He used words and gestures that would be recognized by gang members as challenging and hostile. Irons responded in kind, and the men approached each other. Clay and Jenkins got out of the car, intending to help Medina, and Morris joined them. Olson remained in the car. Clay chased Townsend away and then joined the group in confronting Irons. Medina noticed that Irons was holding a knife, and began to back away. Jenkins punched Irons in the face. Dodging a second blow, Irons stabbed Jenkins with the knife, then ran. Morris and Jenkins chased Irons for a short distance; then Jenkins, who had been stabbed in the heart, fell in the parking lot.

A woman who worked at the QFC was outside the store when the confrontation occurred. She testified that she saw Irons walking toward the store when a group of people tried to surround him, saw one of the men get in Irons's face, and saw Irons push him away and then run off. She did not see the knife and did not see any beer bottles. After Jenkins fell down, she called the police.

Jenkins bled to death in the parking lot. The police found a broken beer bottle in the parking lot. Armed with a search warrant, they later found the knife, wrapped in a towel, under a sofa in Irons's living room.

While awaiting the arrival of the police and trying to stop Jenkins's bleeding, Medina, Clay, Morris, and Olson decided to tell the police that Jenkins had been on his way into the store when Irons attacked him out of the blue. When the police arrived, each of them told that story. But within a few days, each gave taped statements to the police, admitting that Medina had started the altercation and that Jenkins had hit Irons before Irons stabbed him. Each also testified at trial, contradicting various of his earlier state-

ments to the police and also contradicting each other's testimony with respect to various details about the altercation—most notably, as to whether Medina was still holding his beer bottle when he challenged Irons to fight, and whether Medina broke the beer bottle before or after the stabbing. Olson testified that he saw Irons put a red rag into his back pocket—a gang signal that he wanted to fight. He also testified that Jenkins was carrying a black rag, which was also a gang signal. Medina testified that he tried to stop Jenkins's bleeding with a black rag he took from Jenkins's pocket—and that he had lied to the police about where he got the rag because he did not want them to think the fight was gang-related.

The State charged Irons with second degree murder. At the end of trial, the trial court instructed the jury that homicide is justifiable when committed in the lawful defense of the defendant when he "reasonably believed that the victim intended to commit a felony and inflict death or great personal injury[.]" Clerk's Papers at 64. Irons objected to this instruction, arguing that it misstated the law under the facts of this case:

> The concern that the defense has with that instruction, although it appears to be a very literal recitation of the WPIC, is [ ] ["]the victim["] language]. In this case there is undisputed testimony that there were four individuals outside of a car, at least one of which was armed with a bottle, a beer bottle.
>
> . . . .
>
> . . . And if any one of those four individuals acting as a group of one, so to speak, were to attempt to inflict great bodily injury or commit a felony against the defendant, he is entitled to defend himself.
>
> So I think this instruction leads to the mistake of the law . . . this instruction, in my opinion, leads the jury to believe that they are only to consider the actions of Michael Jenkins, and that is not true.
>
> And I would insert ["]the defendant reasonably believed that the group or a member of the group intended to commit a felony and inflict great bodily injury.["] That is the evidence in this case.

Report of Proceedings at 530-31. The trial judge declined to modify this instruction, ruling: "The fact of the matter is that it is Michael Jenkins who was the victim in this case who was fatally stabbed, and I believe that the instructions accurately reflect the charges and the law." *Id.* at 534.

The jury convicted Irons of the lesser-included offense of first degree manslaughter. Irons appeals.

## DISCUSSION

Irons contends that the trial court erred by giving the jury a justifiable homicide instruction that required the jury to find that the defendant reasonably believed that *the victim* intended to commit a felony and inflict death or great personal injury, and refusing to instruct the jury that a homicide is also justifiable if the defendant reasonably believed that *a group or a member of the group* intended to commit a felony and inflict death or great personal injury.

Jury instructions are sufficient if they are supported by substantial evidence, allow the parties to argue their theories of the case, and when read as a whole properly inform the jury of the applicable law. *State v. McLoyd*, 87 Wn. App. 66, 71, 939 P.2d 1255 (1997), *aff'd sub nom. State v. Studd*, 137 Wn.2d 533, 973 P.2d 1049 (1999). "Each side is entitled to have the jury instructed on its theory of the case if there is evidence to support that theory." *State v. Williams*, 132 Wn.2d 248, 259, 937 P.2d 1052 (1997). "Failure to give such instructions is prejudicial error." *State v. Riley*, 137 Wn.2d 904, 908 n.1, 976 P.2d 624 (1999). "To be entitled to a jury instruction on self-defense, the defendant must produce some evidence demonstrating self-defense; however, once the defendant produces some evidence, the burden shifts to the prosecution to prove the absence of self-defense beyond a reasonable doubt." *State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997). "Evidence of self-defense is evaluated 'from the standpoint of the reasonably prudent person, knowing all the defendant

knows and seeing all the defendant sees.'" *Id.* at 474 (quoting *State v. Janes*, 121 Wn.2d 220, 238, 850 P.2d 495, 22 A.L.R.5th 921 (1993)).

■■■ Our Supreme Court has set forth a high threshold for clarity of jury instructions: "The standard for clarity in a jury instruction is higher than for a statute; while we have been able to resolve the ambiguous wording of [a statute] via statutory construction, a jury lacks such interpretive tools and thus requires a manifestly clear instruction." *State v. LeFaber*, 128 Wn.2d 896, 902, 913 P.2d 369 (1996). And where, as here, self-defense jury instructions are at issue, the court has stated that the "instructions, read as a whole, must make the relevant legal standard 'manifestly apparent to the average juror.'" *Id.* at 900 (citations and internal quotation marks omitted). Indeed, a "'jury instruction misstating the law of self-defense amounts to an error of constitutional magnitude and is presumed prejudicial.'" *Walden*, 131 Wn.2d at 473 (quoting *LeFaber*, 128 Wn.2d at 900).

In this case, Irons was entitled to jury instructions on self-defense because he produced some evidence demonstrating self-defense. The trial court, therefore, gave the jury the following instruction:

> It is a defense to a charge of Murder in the Second Degree, Manslaughter in the First Degree, or Manslaughter in the Second Degree that the homicide was justifiable as defined in this instruction.
>
> Homicide is justifiable when committed in the lawful defense of the defendant when:
>
> (1) the defendant reasonably believed that the victim intended to inflict death or great personal injury; and
>
> (2) the defendant reasonably believed that there was imminent danger of such harm being accomplished; and
>
> (3) the defendant employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the defendant, taking into consideration all the facts and circumstances as they appeared to him, at the time of the incident.

The State has the burden of proving beyond a reasonable doubt that the homicide was not justifiable. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

Clerk's Papers (CP) at 64. This instruction is substantially the same as Washington Pattern Jury Instruction: Criminal (WPIC) 16.02. The trial court also gave the jury an instruction that is identical to WPIC 16.07, clarifying that "actual danger" is not required:

A person is entitled to act on appearances in defending himself, if that person believes in good faith and on reasonable grounds that he is in actual danger of great bodily harm, although it afterwards might develop that the person was mistaken as to the extent of the danger.

Actual danger is not necessary for a homicide to be justifiable.

CP at 67.

Irons challenges only the WPIC 16.02 instruction. He does not dispute that this instruction was supported by substantial evidence or that it allowed the parties to argue their theories of the case. He nonetheless contends that this instruction, on its face, is ambiguous. Indeed, our Supreme Court has held that "WPIC 16.02 is not the 'manifestly clear instruction' that jurors require" because "the imminent danger requirement is set off by a separate number and thus lack[s] connection to the reasonable belief qualifier." *Studd*, 137 Wn.2d at 546 (citation omitted). Nonetheless, our Supreme Court held that the "presumptively prejudicial" ambiguity in WPIC 16.02 was clarified by the addition of a WPIC 16.07 instruction, where the defendant—who was charged with two counts of aggravated first degree murder for killing two police officers—maintained that he killed his two victims because they were both assaulting him. *State v. Hutchinson*, 135 Wn.2d 863, 868-69, 885, 959 P.2d 1061 (1998), *cert. denied*, 525 U.S. 1157 (1999). Thus, the court concluded that WPIC 16.02 and WPIC 16.07,

when read together, "adequately conveyed the law of self-defense to the jury in [that] case." *Id.* at 885

In this case, the trial court also gave the jury a WPIC 16.02 instruction and a WPIC 16.07 instruction. Moreover, the theory Irons presented at his trial was the same as the theory presented by the defendant in *Hutchinson*: his actions were reasonably necessary to defend himself, considering his belief that he was in imminent danger. But in contrast to the facts involved in *Hutchinson*, i.e., one defendant maintaining he was assaulted by both of his victims, the record in the present case indicates that Irons was surrounded by four men, three of whom intended to assist the fourth in confronting Irons, and that one of these men—not the victim—threatened Irons with a beer bottle. Although these instructions make the legal standard for self-defense manifestly clear where a defendant has been threatened by his or her victim or victims, Irons contends that the trial court's instructions inadequately conveyed the law of self-defense to the jury under the facts of his case because they "did not make it manifestly clear to the jury that it could consider the fact that Irons was faced with multiple assailants." Appellant's Br. at 25. We agree.

We recognize that the self-defense instructions in this case properly instructed the jury to take "into consideration all the facts and circumstances as they appeared to [the defendant], at the time of and prior to the incident." CP at 64. They also correctly informed the jury that Irons was entitled to defend himself if he believed "in good faith and on reasonable grounds that he [was] in actual danger of great bodily harm[.]" *Id.* at 67. But the problem arises after considering the additional language requiring that "the defendant reasonably believed that *the victim* intended to . . . inflict death or great personal injury; and . . . the defendant reasonably believed that there was imminent danger of *such harm* being accomplished[.]" *Id.* at 64 (emphasis added). This additional language requires the jury to consider only the actions and intentions of *the victim* in assessing Irons's reasonable belief. In a case involving multiple assailants, this language can easily be read to

modify the portion of the charge that instructs the jury to consider *all facts and circumstances* as they appeared to the defendant. When read together in a case involving multiple assailants who were acting in concert with the victim, these jury instructions become internally inconsistent and, therefore, ambiguous. As our Supreme Court observed in *State v. Meyer*, 96 Wash. 257, 263, 164 P. 926 (1917), an instruction that is correct in the abstract, or correct as applied to one set of facts, may become misleading when applied to another set of facts.

Although this is an issue of first impression in Washington, other states have dealt with it and reached the same conclusion that we now reach. For example, in *People v. Cuevas*, 740 P.2d 25, 25-26 (Colo. Ct. App. 1987), the defendant was associated with a gang called the Califas. The victims belonged to a rival gang called Los Meadows. *Id.* On the night of the offenses, a group of Los Meadows members went looking for Califas to fight. *Id.* They discovered a number of them in a cul-de-sac drinking. *Id.* The Los Meadows jumped out of their cars and the Califas hid behind their cars. *Id.* The Los Meadows armed themselves with rocks, a pool cue and a tire iron and began to advance toward the Califas. *Id.* The defendant then opened fire with a handgun, wounding three of the Los Meadows. *Id.* One of the Los Meadows fired back. The Califas fled in their car when that person stopped to reload. *Id.* The defendant was convicted of three counts of attempted second degree murder, three counts of crime of violence, and engaging in a riot. *Id.* at 25. The trial court gave a pattern jury instruction on self-defense stating that the defendant had the right to use force to defend himself from the use of unlawful physical force "by the victim." *Id.* at 26 (citation omitted). The defendant appealed, arguing, inter alia, that the court should have instructed the jury to consider the degree of threat posed by multiple assailants. *Id.* at 27. The Colorado Court of Appeals agreed:

> The totality of the circumstances, including the number of persons who reasonably appeared to have been a threat to the

defendant, should be considered by the jury in determining whether the defendant's use of force was necessary and reasonable.

*Id.* (citing *People v. Jones*, 675 P.2d 9 (Colo. Ct. App. 1984)); *accord People v. Auldridge*, 724 P.2d 87, 88 (Colo. Ct. App. 1986) (concluding that the trial court committed reversible error by failing to instruct the jury that the defendant had the right to use force to defend himself from the use of unlawful physical force by "the victim or those whom the defendant reasonably believed were acting in concert with the victim in the use or imminent use of unlawful physical force against the defendant," thereby precluding the jury from considering the defendant's right to act upon reasonable appearances in a multiple-assailant attack) (citation omitted)).

In *Lucas v. Commonwealth*, 141 Ky. 281, 132 S.W. 416, 416-18 (1910), the defendant was convicted of manslaughter for killing William Sagaser by shooting him three times. The defendant allegedly believed that Sagaser, in concert with three other men, intended to rob him and his friend; a belief the defendant formed when Sagaser hit the defendant in the head with a slung-shot. *Id.* at 417–18. The defendant asked the trial court to instruct the jury that he had the right to shoot and kill Sagaser in self-defense if the defendant had reasonable grounds for believing, at the time, that he or his friend were in danger of loss of life or great bodily harm at the hands of Sagaser, or of his companions, or any or all of them acting in concert with Sagaser. *Id.* at 418. Instead, the trial court instructed the jury to consider only the defendant's reasonable belief that he or his friend were in danger of loss of life or great bodily harm at the hands of Sagaser. *Id.* Because there was evidence from which a rational juror could conclude that Sagaser and his companions were acting in concert, the appellate court reversed and remanded for a new trial. *Id.* at 418–19. *See also Small v. Commonwealth*, 257 S.W.2d 906, 907-08 (Ky. 1953) (facts fully justified instructions defining the right of the accused to defend himself against

the attack of persons other than the victim; limitation of the instruction on self-defense to acts of the victim failed to present the real defense, namely that the defendant had the right to defend himself from assault by the victim and his comrades who were attacking as a group).

Similarly, in *McCuin v. State*, 505 S.W.2d 831 (Tex. Crim. App. 1974), the defendant's murder conviction was reversed and he was granted a new trial because the trial court's self-defense instruction confined the defense to an attack by the deceased, not by multiple assailants. The defendant testified that he and his brothers, the McCuins, went to a park where they were surrounded by four Lacey brothers. *Id.* at 831. Both sides were armed. *Id.* A melee ensued, at the end of which one Lacey and one McCuin lay dead. *Id.* The court ruled that where there is evidence, from the accused's standpoint, that the accused was in danger of an unlawful attack by more than one assailant, the charge of the court is too restrictive if it confines the right of self-defense to the acts of the deceased. *Id.* at 832; *see also Lerma v. State*, 807 S.W.2d 599, 601 (Tex. App. 1991) (concluding that a defendant is entitled to a charge of the right of self-defense against multiple assailants if there is evidence, viewed from the defendant's standpoint, that he was in danger of an unlawful attack at the hands of more than one assailant).[2]

The State argues in the instant matter that none of the above out-of-state authority is persuasive because (1) in each of those cases the appellate courts found evidence that the defendant had been assaulted both by the decedent and

---

[2] By contrast, in *Dickey v. State*, 22 S.W.3d 490 (Tex. Crim. App. 1999), the Texas Court of Criminal Appeals concluded that although it was error for the trial court to fail to instruct the jury on the defendant's right of self-defense against multiple assailants, the error was harmless because the evidence that the deceased and another were acting in concert was ambiguous at best. Moreover, according to the defendant's testimony, the deceased committed an act that by itself justified the use of deadly force under the instruction given when he pulled a gun. *Id.* at 492. The act of pulling a gun was essential in proving that the deceased was acting in concert with another. By rejecting self-defense, the jury must have disbelieved that the deceased pulled a gun. *Id.* at 493. (Keller, J., concurring). Therefore, the jury would not have believed that the deceased was acting in concert with another by pulling the gun, even if a multiple assailant instruction had been given. *Id.*

at least one additional person, whereas here, only Jenkins actually struck Irons, and Medina, who was the only potential assailant who might be considered armed because he held a beer bottle, had already begun to retreat before the stabbing, by backing away when he saw the knife; and (2) Colorado and Kentucky have significantly different statutory schemes governing self-defense from Washington's because their statutes allow the defendant to use deadly force to protect himself from death or great personal injury from any source, not just from the victim—whereas, the State argues, Washington restricts the source of harm to the victim (the State admits, however, that Texas and Washington have similar statutory schemes).[3]

■■ We disagree that the out-of-state cases are significantly distinguishable from the present case, either on the basis of the kind of evidence of multiple assailants or on the basis of the relevant statutory schemes. The point of these cases is not that more than one of multiple assailants physically assaulted the defendant—in some cases that was so; in others, not. Rather, the question is whether the jury, in assessing the objective reasonableness of the defendant's conduct, ought to be allowed to consider whether the defendant used reasonable force in *all* the circumstances— including the fact that he or she was faced with multiple assailants or potential assailants who reasonably appeared to him to have been acting in concert with the victim, or whether, as Irons's jury was instructed, the jury must assess the objective reasonableness of the defendant's conduct based only on the harm the slayer reasonably believed the victim intended—as if the victim had been acting alone. Moreover, RCW 9A.16.020(3) provides that the use of force

---

[3] The Colorado statute provides: "Deadly physical force may be used only if a person reasonably believes a lesser degree of force is inadequate and: (a) The actor has reasonable ground to believe, and does believe, that he or another person is in imminent danger of being killed or receiving great bodily injury[.]" Colo. Rev. Stat. § 18-1-704(2). The Kentucky statute provides: "The use of deadly physical force by a defendant upon another person is justifiable under subsection (1) only when the defendant believes that such force is necessary to protect himself against death, serious physical injury, kidnapping, or sexual intercourse compelled by force or threat." Ky. Rev. Stat. Ann. § 503.050. Texas Penal Code Ann. §§ 9.31 and 9.32 govern general self-defense and the use of deadly force.

upon another is not unlawful whenever used by a person about to be injured in preventing or attempting to prevent an offense against his or her person, in case the force is not more than necessary—without limitation on the source of the danger. And RCW 9A.16.050 provides that homicide is justifiable in the lawful defense of the slayer when there is reasonable ground to apprehend a "design on the part of the person slain to commit a felony or to do some great personal injury to the slayer . . . and there is imminent danger of such design being accomplished[.]" A "design on the part of the person slain" implies that the person slain need not necessarily be acting alone. Among the definitions of "design" found in Webster's Third New International Dictionary are the following: "A mental project or scheme in which means to an end are laid down; a deliberate undercover project or scheme entertained with discreditable or hostile and often dishonest, treacherous, sinister, or seductive intent[.]" Webster's Third New International Dictionary 611 (1969). Further, it stands to reason that the imminence of the danger of such design being accomplished may increase with the number of persons sharing the plan or purpose of attack. In sum, we find nothing in our statutory scheme evidencing a legislative intent to limit a jury's consideration of *all* relevant circumstances when considering a claim of self-defense, including whether the slayer reasonably believed that several persons were acting in concert with the person slain, and whether they shared with him a design to commit a felony or do great personal injury to the slayer.

Although dealing with a different charge to the jury relating to self-defense, our Supreme Court's opinion in *State v. Walden*, 131 Wn.2d 469, 932 P.2d 1237 (1997), is instructive. There, the defendant became involved in an altercation with three teenaged boys. During the altercation, the defendant produced a knife. None of the teenagers was armed. The defendant, who claimed self-defense, was convicted of two counts of second degree assault. The trial court properly instructed the jury that one has the right to

use force only to the extent of what appears to be the apparent imminent danger at the time, and that where it appears to the defendant that an ordinary battery is all that is intended, he has no right to repel a threatened assault by the use of a deadly weapon in a deadly manner. *Id.* at 475. But the instruction went on to define "great bodily injury" as used in the instruction to mean an injury of "an injury of a graver and more serious nature than an ordinary battery with a fist or pounding with the hand; it is an injury of such nature as to produce severe pain, suffering and injury." *Id.*

The *Walden* court found this definition to be a misstatement of the law in that it conflicted with the definition of self-defense contained in other instructions by injecting an impermissible objective standard into the requirement that the jury consider the defendant's subjective impressions of all the facts and circumstances, i.e., whether the defendant reasonably believed the battery at issue would result in great personal injury. " 'It is well within the realm of common experience that "an ordinary striking with the hands or fists" might inflict [great personal injury], depending upon the size, strength, age, and numerous other factors of the individuals involved.' " *Id.* at 477 (quoting with approval *State v. Painter*, 27 Wn. App. 708, 713, 620 P.2d 1001 (1980)). Given the facts in *Walden*—one person standing against three—we observe that it is equally within the realm of common experience that three people striking with their fists are more likely to inflict great personal injury than only one such person, so that the amount of force that is necessary to prevent the infliction of great personal injury may vary with the number of persons the defendant reasonably believes are about to commence striking him with their fists.

In the instant matter, Irons was confronted first by Medina who was brandishing a 22-ounce beer bottle and using gestures and speech that, among local gangs, amounted to a challenge to fight. Within moments, he was surrounded by four individuals who joined in the fray for the purpose of helping Medina. One of the four, Clay, chased

Irons's friend Townsend away. Another of the four, Jenkins, was carrying a black rag—a significant gang signal. Jenkins struck Irons in the face with his fist and immediately aimed another blow. Medina, although backing away because he saw that Irons had a knife, may or may not still have been holding the beer bottle, depending upon whose subsequent testimony was more believable, but a rational trier of fact could believe that he held the beer bottle aloft when he challenged Irons to fight. In all these circumstances, it was error to instruct the jury to consider whether Irons reasonably believed that Jenkins and only Jenkins, as opposed to Jenkins acting in concert with the others involved in the altercation, intended to inflict death or great personal injury.

Although the instruction allowed Irons to argue his theory of the case, it left him with the burden of overcoming the inconsistency between the instruction as written and his theory that he reasonably believed he was in imminent danger of death or great personal injury from multiple assailants—not just Jenkins. " 'The defense attorney is only required to argue to the jury that the facts fit the law; the attorney should not have to convince the jury what the law is.' " *LeFaber*, 128 Wn.2d at 903 (quoting *State v. Acosta*, 101 Wn.2d 612, 622, 683 P.2d 1069 (1984)).

Where jury instructions are inconsistent, the reviewing court must determine whether the jury was misled as to its function and responsibilities under the law. Where the inconsistency is the result of a misstatement of the law, the misstatement must be presumed to have misled the jury in a manner prejudicial to the defendant unless the error can be declared harmless beyond a reasonable doubt. *Walden*, 131 Wn.2d at 478 (citing *State v. Wanrow*, 88 Wn.2d 221, 239, 559 P.2d 548 (1977), and *State v. Caldwell*, 94 Wn.2d 614, 618, 618 P.2d 508 (1980)).

Here, we cannot find the error harmless beyond a reasonable doubt. That Irons was in fact confronted by multiple assailants who were affiliated with each other and with at least one rival gang is undisputed. That he was challenged

to fight in gang terminology by two of the group, one of whom brandished a large beer bottle and the other of whom actually struck him in the face, is undisputed. That the accosting group had a motive to attack Irons and intended to help each other during the confrontation is undisputed. That one of the group chased away Irons's only friend, leaving Irons to face the group alone, is undisputed. The only disinterested witness to the altercation, a QFC employee, perceived that the group tried to surround Irons and that one of them was in his face. We cannot say that the inconsistency found in the instruction at issue when it is applied to the above undisputed facts did not affect the outcome of this trial.

Reversed and remanded for a new trial.

WEBSTER and APPELWICK, JJ., concur.

Reconsideration denied August 30, 2000.