[No. 2271. Decided December 22, 1896.]

## THE STATE OF WASHINGTON, *Respondent*, v. JOHN McCANN *et al.*, *Appellants*.

CRIMINAL LAW — HARMLESS ERROR — WITNESS — CREDIBILITY — CONSPIRACY — SUFFICIENCY OF EVIDENCE — JUSTIFIABLE HOMICIDE — SELF-DEFENSE — INSTRUCTIONS — REMARKS OF COUNSEL— NIGHT SESSIONS.

Error of the court in refusing to sustain a challenge to a juror for cause is not prejudicial, when the juror is discharged upon peremptory challenge without the defendants' rights in that respect being exhausted.

The refusal of the court to grant a separate trial to defendants jointly indicted is not prejudicial error, when the request therefor is made by only one of the defendants, without joinder therein by the others, and the one demanding a separate trial is subsequently acquitted.

Where a witness has already testified that he was a friend of the deceased, in a prosecution for the murder of the latter, it is not error for the court to sustain objections to questions upon cross-examination relating to business matters between witness and deceased, especially when counsel have failed to exercise their right of questioning him directly as to his feeling toward defendant.

Error of the court in refusing to strike certain testimony cannot be urged on appeal, when no exception was taken to such refusal.

The refusal of the court to discharge one of several defendants jointly indicted for murder is not error as to the other defendants, though the jury may subsequently acquit him, when there is evidence tending to show a conspiracy on the part of all the defendants to commit the murder.

In a prosecution for murder, the court may properly instruct the jury that they have a right to take into consideration the appearance and conduct of the defendant while on the witness stand, and the great interest he has in the result of the verdict.

Where an affray is brought on by defendants, in which severe injuries are inflicted on deceased for the purpose of killing him, and, without attempting to withdraw from the combat, the defendants follow up the deceased, while he retires to arm himself, and, in the continuance of the affray subsequent to such arming by the deceased, they kill the deceased, they cannot avail themselves of the doctrine of justifiable homicide on the ground of necessary self-defense.

Where a conspiracy having violence and murder as its object is proved, although largely by circumstantial evidence, the acts and declarations of each in furtherance of the conspiracy are the acts and declarations of all; but, although a common design is the essence of the conspiracy, it is not necessary to prove the terms in which defendants came together and agreed upon their common design.

A charge to the jury that, "to justify the taking of life in self-defense it must appear from the evidence that the defendants not only really and in good faith endeavored to decline any further struggle and to escape from their assailant before the fatal shot was fired, but it must also appear that the circumstances were such as to excite the fears of a reasonable person," etc., is erroneous on the ground of implying that defendants were called upon to retreat or flee before they could be justified in taking deceased's life in self-defense.

The refusal to give an instruction as requested is not error, where its substance is given, although in different language; but where instructions requested are pertinent and clear, they should be given rather than others of a more general nature substituted by the court.

Improper remarks of the prosecuting attorney to the jury are not ground of reversal, when it does not appear that the court has been called upon to direct the jury to disregard them.

The holding of night sessions of court during the pendency of a criminal trial is a matter within the discretion of the court.

Appeal from Superior Court, King County. — Hon. T. J. Humes, Judge. Affirmed.

*James Hamilton Lewis, W. R. Gay, W. H. White,* and *Walter S. Fulton,* for appellants.

*A. W. Hastie,* Prosecuting Attorney, and *W. H. Morris,* for The State.

The opinion of the court was delivered by

SCOTT, J.—The defendants were informed against and prosecuted for the murder of one Joseph Cicero. The charging part of the information was as follows:

"They, the said John McCann, James McCann and Michael McCann, in the county of King, in the State of Washington, on the twenty-first day of August, A. D. 1895, purposely and of their deliberate and premeditated malice killed one Joseph Cicero by then and there purposely and of their deliberate and premeditated malice, shooting and thereby mortally wounding the said Joseph Cicero, with a revolver pistol, had and held by them, the said John McCann, James McCann and Michael McCann, from which said mortal wound the said Joseph Cicero then and there died."

Michael McCann, the father of the other two defendants, was acquitted by the jury, but John and James were found guilty of murder in the first degree and are under sentence of death. Their appeal therefrom presents a great many questions which will be taken up in detail, and the facts connected with the homicide will substantially appear in the discussion of certain of them.

The first errors alleged relate to the refusal of the court to sustain challenges for cause to two of the jurors who were called to try the case, but as the record shows that the defendants afterwards peremptorily challenged both of them and did not use all of their peremptory challenges, there was at least no harmful error. *State v. Moody,* 7 Wash. 395 (35 Pac. 132).

The defendants were all charged in one information, and elected by one of their attorneys to be tried together, and a continuance was granted them to prepare for trial with that understanding. The defendants were not present in court when this was done, and subsequently, when the cause was called for trial, one of the defendants, Michael McCann, demanded a separate trial, which the court refused to grant, and this is alleged as error. But as Michael McCann was acquitted and the two other defendants did not join in the request of Michael McCann that he be tried separately, and did not demand separate trials for themselves, there was no prejudicial error here.

It is contended that the court erred in sustaining objections to certain questions asked witness Parhm upon his cross-examination by counsel for the defendants. The first one was, "You were connected with him [Cicero] when he ran a saloon in this city?" The objection to this was properly sustained, for it assumed as a fact that the deceased once conducted a saloon, of which there was no evidence, and it did not tend to show what the feeling was between the witness and the defendants and was directed to business matters only between the deceased and the witness, and, furthermore, the question was thereafter substantially answered in the further examination of the witness. The remaining questions were directed to occurrences between the deceased and the defendants, relating to altercations over road matters, and the part that the witness took therein. The objection was properly sustained to these questions. The witness had already testified that he was a friend of the deceased, and the court informed counsel for the defendants that he might interrogate the witness as to what feeling he had, friendly or unfriendly, towards the defendants,

and this was all the defendants were entitled to show; but counsel did not see fit to examine the witness upon that subject.

The next error assigned is the refusal of the court to strike certain testimony given by one Weiss, relating to an occurrence between the deceased and John McCann some months previous to the homicide, and in answer to the question, "Where did this conversation take place?" the witness answered, "Right there. Very near where he *murdered* him this year."

It is contended that this answer was objectionable as giving the conclusion of the witness with reference to the guilt of the defendants. But it was not specially objected to on that ground at the time. Counsel for the defendant said:

"It impresses me, may it please the court, that this does not come within your honor's suggestion, and I move to strike it all out."

The suggestion referred to was made in ruling upon an objection to a prior question as immaterial and irrelevant, wherein the court said:

"If the witness recalls a conversation where any threats were made I think it is proper for the witness to state it."

Other questions were asked and answered after this ruling and prior to the question and answer above given, and the motion was apparently directed to the whole of it. In response to the motion, the court said:

"I do not think there is any necessity, particularly, to strike it out, if the jury do not understand any more about it than the court does.

The particular testimony of the witness above given was objectionable to the extent of stating his conclu-

sion that the deceased was murdered, and if a motion to strike said answer upon that ground had been made, it might be considered that a refusal of it would have tended to impress the jury that the conclusion of the witness as to the crime charged was competent testimony and might have resulted in harmful error, but it is apparent that the testimony was treated as of no consequence, and what did really occur was probably equivalent to striking it out. However, no exception was taken by the defendants to the court's refusal to strike the testimony, and this is a sufficient legal answer to the objection urged, and it is also evident from the whole course pursued that the defendants as well as the court treated the testimony of the witness as trivial and entitled to little or no weight.

When the state rested, the defendants moved to discharge Michael McCann on the ground that there was not sufficient evidence of guilt as to him to warrant submitting the matter to the jury. Michael McCann was acquitted, and of course he was not injured by the ruling, but it is contended that the other defendants were, on the ground that they would have been entitled to have certain of the testimony relating to the doings of Michael McCann stricken from the case after he was discharged. However this may be, we are of the opinion that there was sufficient evidence as to the guilt of Michael McCann, and of a conspiracy upon the part of all three of the defendants to warrant the court in submitting the whole case to the jury.

It appears that the McCanns, father and sons, lived together upon a farm. Cicero, the deceased, lived upon another farm near by, his house being about an eighth of a mile from McCann's house, and they had all resided at said places respectively for some con-

siderable time previous to the homicide. The deceased and the McCanns had been upon bad terms for some time. At the time of the homicide, Cicero was working upon the road with a Mr. Davis and a Mr. Provan, at a point about one-third of the way from his house to McCann's house. The tragedy occurred soon after the noon hour of said 21st day of August. At some time in the forenoon of said day Michael McCann came up to where Cicero was at work and had a wordy altercation with him relating to a coming election for road supervisor, for which position one of the McCann boys was a candidate. Cicero was opposing him and supporting another candidate. One Mr. Botsford was also present at this conversation. The testimony is somewhat conflicting as to just what was said between Cicero and Michael McCann at this time, but it is not necessary to set it forth in detail. There was testimony to show that during this time Michael McCann said to Cicero in substance that he, [Cicero], was not a naturalized citizen and had no right to vote, and that they [the McCanns], would " take damned good care " that he did not vote, and also said to him that they would " do him up," and " do him up damned quick, and wouldn't go behind stumps and logs and trees to do it either; " that after this altercation Michael McCann passed on to a neighbor's house, about a quarter of a mile distant, and that, while there, he told these neighbors, Mr. and Mrs. Frank Sale, of the difficulty he had just been having with Cicero, and among other things said he had " a good mind to get Jimmy to knock out his [Cicero's] brains." There was other testimony to show previous threats made by Michael McCann against Cicero to the effect that if Cicero came to the polls and tried to vote at the election for road super-

visor he would never go away again; also that on the day previous to the homicide he had angry words with Cicero, and among other things said to him : "Well, you are nothing but a God-damned gambler anyway, and we will fix you. We'll put you where that you won't bother us on election day." The testimony shows that Michael McCann left Sale's house about 12 o'clock, returned to his own house, and found his two sons, John and James there, they having been working on his farm where they all resided, during the forenoon of said day, and it appears by both Michael McCann's and James McCann's testimony that they talked about the difficulty Michael McCann had shortly before then had with Cicero, although they both testified that Michael McCann said it did not amount to anything, and made light of it.

The testimony further shows that Michael McCann then immediately went up to or near Cicero's place and talked with Provan; that Cicero was near by, having just come out of his house from dinner, but it does not appear that any conversation took place between Cicero and McCann at this time, and McCann returned home. There is testimony to show that immediately upon his reaching his house the second time his two sons, John and James, started for the place where Cicero had resumed work upon the road, as they say, to have a talk with him. But it appears that James McCann first armed himself with a revolver which he borrowed from a neighbor and carried in the pocket of a long coat he had just put on, while John McCann was in his shirt sleeves, the day being a warm one; that they approached Cicero rapidly and that James McCann immediately attacked him, saying, "You are going to whip old man Mc-

Cann, are you?" It is unnecessary to pursue the facts further with reference to this point. We think that the bad feeling which had existed between Cicero and the McCanns for some time, the fact that the McCanns were all living together in the same house and had every opportunity to confer with each other in regard thereto, the trouble between Michael McCann and Cicero on the day of, and shortly before, the homicide, the threats made by Michael McCann then and previously, the communication had between Michael McCann and his sons regarding his altercation with Cicero soon after its occurrence on the day of the homicide, the fact that the boys armed themselves and immediately attacked Cicero, and the testimony showing that James McCann said to Cicero as he approached him, "You are going to whip old man McCann, are you?" which tend to show a conference and mutual understanding of the defendants, justified the action of the court in the premises, and that there was no error in the particular claimed.

It is next contended that the court erred in instructing the jury that they had a right to take into consideration the appearance and conduct of the witnesses while on the witness stand, etc., and the right to consider the great interest the defendants had in the result of the verdict. A similar instruction was sustained by this court in *State v. Nordstrom*, 7 Wash. 506–513 (35 Pac. 382), and we think it was not error.

The next matters urged relate to the eighth assignment of error, which was that the court erred in failing to instruct the jury as to the law applicable to the state of facts the evidence of the appellants tended to prove. The argument hereon and this assignment are very general. The defendants state that they submitted some fifty requests to charge, in most of which they

17 — 16 WASH.

sought to embody and apply the law applicable to the theory of the defense, and that but one of them was given. The matters urged here are not specific enough to warrant a discussion of them, but they are all involved with and covered by points and arguments elsewhere presented in the brief, and especially under that part in their brief, where it is urged in substance that the court in charging the jury treated the whole matter as one continuous affray and erred in so doing, and in the instructions given, and erred in refusing to give the defendants' request No. 19, which was as follows:

"19. You are instructed that although you may believe from the evidence in this case that the defendants commenced the fight and made the first attack upon the deceased, if you believe that they had withdrawn from such attack, then the right of the deceased to employ force against the defendants ceased, and if the deceased did not desist from attempting to use violence towards the defendants, the defendants had a perfect right to defend themselves, and if they then found themselves in apparent danger of losing their lives, or of sustaining great bodily injury at the hands of the deceased, they had the same right to take the life of the deceased that they would have had if they had not originally commenced the fight. In other words, if the jury find from the evidence that the defendants first assaulted the deceased; and that after such assault was at an end, the deceased left the defendants, went to his house, procured a weapon and returned towards the defendants with the apparent intention of resuming the affray by killing or inflicting great bodily harm upon the defendants, or either of them, and that the defendants in good faith believed that such was the intention of the deceased, even though as a matter of fact the deceased had no such intention, yet if his acts and movements were reasonably sufficient to induce in the minds of the defendants an honest

belief that such was the deceased's intention; if you so find, you are justified in believing the deceased the aggressor, and that the defendants were justified in standing their ground and taking the life of their assailant."

In considering this, a further reference to the facts is necessary. James and John McCann were twenty-eight and thirty-one years of age, respectively. It is conceded that they attacked and killed Cicero, but it is contended that there were two separate affrays, and that while they were the aggressors in the first one, Cicero was the aggressor in the second and that they then only acted in self-defense. While the testimony was somewhat contradictory, more particularly as between that given by the witnesses for the state and the testimony of the defendants personally, it was ample to show a most unprovoked assault in the first instance. There was testimony to show that James McCann had a handkerchief wrapped around the hand with which he struck Cicero immediately upon coming up to him. The claim on the part of the state was that he had some hard, blunt instrument in his hand concealed by the handkerchief, which he used in striking. He struck Cicero, knocking him down, and struck him several blows after he was down. One of the blows received by Cicero upon his left temple broke his skull, and physicians testified that it was sufficient in itself to result in death, and there was testimony to show that said injury was received at that time. In fact we do not understand it to be claimed by the defendants that Cicero received any injury after that time aside from the gun-shot wound. As to the part that John McCann took at this time, there was testimony to show that he prevented the others from interfering with James in his attack upon Cicero, and

that he said to James, "Give him some of that you've
got in your pocket, Jim. God-damn him! Give him
the gun." After James McCann stopped beating him,
Cicero got up, went a few feet and sat down on a log,
badly injured and in a dazed condition. He sat there
but a moment or so and then got up and started to-
wards his house. The appellants testify that he said
for them to wait, that he would be back. The undis-
puted testimony shows, and appellants concede, that
they followed him. The other persons there went in
the same direction. From all that had occurred up
to this time it is clearly apparent that the above re-
quested instruction was not applicable to the facts of
the case or any of the testimony. It was based entirely
upon what took place prior to the commencement of
what the appellants contend was a second and separate
affray, and their own and all the testimony shows that
they made no attempt whatever to withdraw during
that time. The conceded fact that, instead of at least
remaining where they were, or better still, going to-
wards their own home, they followed Cicero, can be
interpreted in but one way, and that is a desire, or at
least a willingness to renew or continue the conflict.
They were in no immediate danger and neither of
them had been harmed. Upon the undisputed facts,
there was no error in refusing to give said instruction,
and whatever possible claim the appellants could make
as to an attempt or desire upon their part to discon-
tinue or withdraw from the affray must be based upon
what subsequently occurred, and that will be consid-
ered with the instructions given by the court upon the
subject of an attempt to withdraw. The testimony
shows that Cicero went into his house, obtained a
rifle and started back, that his wife and others present
in the house undertook to dissuade him, but that they

were unable to prevent him from going out. It appears that at this time Cicero's face and head were badly bruised and swollen, one eye being swelled shut, and that his face was bloody. The appellants had followed him up to within a short distance of his house, and secreted themselves behind a stump and a log. There is a conflict in the testimony here also with reference to the time they so secreted themselves—as to whether it was before Cicero reappeared upon the scene, or whether it was when they saw him returning with the gun. It is unnecessary to set it forth in detail, nor is it necessary to set forth the remainder of the testimony as to what occurred, but the substance of it will be given and the claimed facts by the appellants stated to present the questions raised by them thereon. There is a conflict as to whether James McCann opened fire on Cicero with the revolver when he first reappeared, or whether he fired it in the air, as they testified, to induce him to go back. The testimony shows that they, or one of them, shouted to Cicero at that time, "Go back, Cicero! Go back!" Cicero fired at least one shot from the rifle, which took effect in James McCann's left arm, making a flesh wound. There is testimony to show that he fired more than once. The testimony shows that James McCann ran up and grappled with him—appellants claim, to prevent him from doing them further injury. In the struggle which ensued they fell to the ground, Cicero on top, and the rifle on the ground near them. It is uncertain whether or not James McCann had dropped the revolver. John McCann ran up to them and either picked up the revolver from the ground or took it from his brother's hand. He admits seizing hold of Cicero and lifting him partly up and throwing him aside. He claims that he did not know how the re-

volver was discharged — that he heard the report, but thought it was the rifle that was discharged. But the other testimony shows that he deliberately placed the muzzle of the revolver against Cicero's head and fired it and then shoved him aside. Cicero died immediately.

There had been no attempt on the part of the McCanns to get away, but of course there may have been a desire upon their part to discontinue or withdraw from further conflict when Cicero appeared with the gun. Upon this subject the court instructed the jury that:

" If you believe from the evidence that the defendants acting conjointly sought a difficulty with the deceased for the purpose of killing him, and without attempting to withdraw from said difficulty, but purposely and of their deliberate and premeditated malice with a deadly weapon took the life of Joseph Cicero, it is murder in the first degree.

" The defendants cannot avail themselves of necessary self-defense if the necessity of that defense was brought on by the deliberate and unlawful acts of said defendants and they made no effort to withdraw from the combat."

This covered the law of the case, and, in the absence of a request for a more specific one applicable to the facts, was sufficient, and there was no error in the premises. The time from the commencement of the attack to the killing of Cicero was short — a matter of some minutes only — and the claim upon the part of the state was that it was all one continuous affray.

The next matter urged as error was the refusal of the court to give certain instructions requested on the subject of a conspiracy on the part of all three of the defendants. By these instructions the court was asked to charge the jury that there was no evidence of such

a conspiracy and no evidence of guilt as to Michael McCann. These matters have been practically disposed of in considering the motion for the discharge of said defendant, and as we are of the opinion there was evidence of a conspiracy and of his guilt, the instructions were properly refused. The court instructed the jury on that subject as follows:

"If a conspiracy having violence and murder as its object, is fully proved, then the acts and declarations of each in furtherance of the conspiracy are the acts and declarations of each of the conspirators.

"If the jury believe from the evidence that the state has proved a conspiracy between all the defendants to take the life of the deceased, and that they did so take the life of the deceased, then you are charged that in considering the guilt or innocence of the defendants, you may take into consideration every act and declaration of each member of the conspiracy in pursuance of the original concerted plan, and with reference to the common object which has been given in evidence before you. You are instructed as a matter of law, that the evidence and proof of conspiracy will in general be circumstantial, and although common design is the essence of the conspiracy, it is not necessary to prove that the defendants came together and actually agreed in terms to have that design and precede it by common consent."

It is conceded that these were correct as abstract propositions of law, but contended that they were erroneous as applied to the facts of this case, and especially when considered with certain requests submitted by the defendants, wherein they asked the court to instruct the jury that they could not take into consideration, as against John McCann or James McCann, any threats witness Frank Sale testified were made by Michael McCann, and by separate instructions asked the same as to the testimony of each of the other wit-

nesses relating to such threats. It is argued that none of them were made during the pendency of the conspiracy and in furtherance of the design, conceding that there was evidence of a conspiracy at all upon the part of all three of the defendants; that they were statements made in casual conversations and not shown to have been communicated to the other defendants; but the proof of the conspiracy was, as is usually the case, circumstantial. It cannot be said just when it was entered into.  It culminated in the attack upon Cicero. The most damaging statements were those made just before the attack, which were testified to by Frank and Sarah Sale and Botsford, on account of the nearness of the time.

We think these were clearly competent, and while, of course, no witness testified directly that they had been communicated to the boys, because, as is likely, no one would have known of such communication but the defendants, the acts of the parties were in evidence before the jury and strongly indicated a mutual design and understanding.  The threats made at a previous time could add nothing to the force of these made at the time, for it was certainly of small consequence whether the threats or the same statements in substance were made by Michael McCann four times instead of three.  They were introduced in evidence for the purpose of convicting Michael McCann, who was not present when Cicero was killed, and it is further argued that as the jury acquitted him they must have found that there was no conspiracy and that the court erred in not instructing that they were entitled to no weight as against the boys, but we do not think there was any error in submitting them to the jury as against all three of the defendants.  The court did instruct that they were evidence only in case a conspiracy was

proved, in the instructions above given. The fact that Michael McCann was acquitted would rather go to show that the jury attached little or no weight to them, if they were not sufficient to hold the party who made them, and to show that they were without injury as far as the appellants were concerned, especially when the attack upon Cicero by them is conceded. With reference to these statements counsel has cited us to the case of *State v. McGee*, 81 Iowa, 17 (46 N. W. 764), but a reading of that case will show that it is not applicable to the facts of this case.

It is also contended that it was error for the court to submit to the jury the evidence of a conspiracy without instructing the jury as to what a conspiracy was in legal contemplation. It was certainly partly defined in the instruction given, that is, a common design, etc., and we do not find that any more specific instruction was requested by the defendants; therefore there was no error in not more fully defining it.

It is further contended that the court erred in instructing the jury on the subject of self-defense and refusing certain requests submitted by the defendants. The particular one questioned, that was given, was as follows :

"To justify the taking of life in self-defense it must appear from the evidence that the defendant or defendants not only really and in good faith endeavored to decline any further struggle and to escape from their assailant before the fatal shot was fired, but it must also appear that the circumstances were such as to excite the fears of a reasonable person, viewed from defendant's stand point, that the deceased intended to take his or their life or to inflict great bodily harm, and that the defendants really acted under the influence of these fears, and not in the spirit of revenge."

It was given in connection with and just preceding the two instructions hereinbefore first set forth, where the matter of withdrawing is mentioned. It is contended that this instruction incorrectly states the law, for the reason that the jury must have understood from the language used that the appellants were called upon to retreat or flee from Cicero, before they could be justified in taking his life in self-defense, and it is claimed to have been specially injurious because the defendants made no claim of attempting to retreat or flee. It is contended that the defendants had a right to stand their ground, that they were in the county road, a place where they had a right to be, when Cicero appeared with the gun. The evidence was contradictory as to this, there being some testimony to show that they were upon Cicero's premises; but, be this as it may, the appellants were of course entitled to the benefit of that in their favor when considered with reference to the instructions to be given. In order to render this point available to them, it must be conceded that there was proof to show two separate affrays, and that Cicero was the aggressor in the second affray. This might be straining the testimony somewhat, as the time of the whole of it from beginning to end was very short, and the appellants could have had but one purpose after the first affray in following Cicero. It is not contended by them that they had any particular purpose in going in that direction; they simply assert that they were in the county road and that they had a legal right to be there. While this may be true ordinarily, yet after the unprovoked and aggravated assault made by them upon Cicero, their following him towards his house thereafter was entirely unjustifiable.

While it is contended that they were not called

upon to flee when Cicero appeared with the gun, but had a right to stand their ground and resist his attack, it seems as though the necessity for taking his life ended when he was deprived of the gun. Of course appellants claim, especially by the testimony of John McCann, who shot Cicero, that the shooting was unintentional and accidental. The defendants had the benefit of this testimony before the jury, but the jury evidently did not believe them.

A great many requests to instruct the jury were submitted by the defendants, and they are too numerous and long to be set forth herein, likewise the instructions given by the court to the jury were voluminous and covered every phase of the question, and the discussion so far has been with reference to a few of them questioned by the appellants. While there might be some ground for the contention that the word, "escape," might have been interpreted by the jury as requiring the defendants to flee when Cicero appeared with his gun, we think, in the connection in which it was used, it was harmless,

Of course, as an abstract proposition of law, if the first affray had entirely ended and the defendants were where they had a right to be and were attacked by Cicero with a rifle, they would not be called upon to expose themselves to the risk of being shot down by attempting to run away. It is evident, from their own testimony, that they made no attempt to get away. The most they could claim was a desire to discontinue the affray when Cicero appeared with the gun, and that there was only an attempt on their part to defend themselves thereafter and prevent him from harming them.

The court, as before said, properly instructed the jury upon the subject of withdrawing, etc. The in-

structions given were not numbered and the parts of them excepted to were set forth in the exceptions taken.    Those parts relating to withdrawing were so excepted to, and also calling upon "the defendants to decline a struggle before they would have a right to assert their self-defense."    But we find no such exception to the word, "escape," or any part of said instruction last set forth in the exceptions noted, and it is evident that counsel understood them all as meaning substantially the same thing, and not that the defendants were called upon to run away when Cicero came out with the rifle.

The instructions requested by the defendants upon the subject of self defense were not applicable to the facts of this case, where they were themselves the original aggressors, and for that reason they were properly refused by the court, and the others substituted, which were given, were sufficient.

It is next contended that the court erred in refusing to instruct the jury as requested, in substance, that the bare presence of James McCann at the time of the shooting was not sufficient to convict him, that there must have been an intention on his part to kill, etc., as such request was intended to present the attitude of James McCann, as he did not fire the shot that killed Cicero.    The substance of this instruction was given, although in different language.    Ample definitions of what constituted murder in its different degrees were given by the court, and that in order to convict a person of murder in the first degree, there must have been purpose, malice and premeditation, etc., with the intention of taking life.    The court also gave the usual instructions that the presumptions of law are in favor of the innocence of the defendants, and that the burden was upon the state to prove each

and all of the allegations beyond all reasonable doubt; that every person accused of crime is clothed with the presumption of innocence, and if, after a consideration of all the evidence in the case, the jury had "a reasonable doubt as to the guilt of the defendants or either of them," the verdict should be "not guilty as to such defendant as to whose guilt you have such reasonable doubt."

It is further contended that the court erred in instructing the jury that "it is sufficient if there was a design and determination to kill distinctly formed in the mind at any moment before or at the time the fatal shot is fired." Our attention is called to the case of *State v. Rutten*, 13 Wash. 203 (43 Pac. 30), which case this court has lately had occasion to examine upon this point. (*State v. Straub, ante* p. 111). We will not consider it further in this case, for it is conceded that no exception was taken to it. Even though it stated the law too strongly under our statutes, there is every indication that it was harmless in this instance, considering the testimony and the whole instructions given.

Another error claimed is that the evidence is insufficient to justify a conviction of murder in the first degree. In discussing the previous questions we have not undertaken to present it as strongly against the defendants as the testimony upon the part of the state might warrant, but enough has been shown, it seems to us, in what has been said, to render a discussion of this point unnecessary. We are of the opinion that the evidence was ample to sustain the conviction.

It is next contended that the motion for a new trial should have been granted on account of the misconduct of the prosecuting attorney in his closing argu-

ment in making certain statements to the jury. The record with reference to this is as follows :

"During the closing argument by Prosecuting Attorney Hastie, to the jury, defendants excepted to the following remarks made by him :

"'Defendants did not dare to have good reputation put at issue. They cannot prove good reputation unless put at issue.'

"'Now the mud in that rifle that Cicero had thrown to the ground — there is the mud —'

"Mr. Lewis. 'I do not like to interrupt you—the boys said they used it as a crutch coming down.'

"Mr. Hastie. 'It was brought there and offered in evidence.'

"The Court. 'Proceed.'"

It does not appear that the court acted upon it in any way, or that he was asked to direct the jury to disregard it. While the remark with reference to reputation, etc., was improper, it was not sufficient to require a reversal. There had been an attempt to prove the good reputation of one of the appellants only.

Appellants further complain because the court held night sessions during the pendency of the trial, but this was a matter which was within the discretion of the court. Appellants were defended by several able lawyers and there is nothing to indicate that they were unduly hastened, and did not have ample time to protect the appellants' interests during the trial.

After an examination of the long record sent up in this case, and of the voluminous brief filed by the appellants, we are of the opinion that there is not a single question of law urged that would entitle them to a reversal, and that there is nothing in the facts that would warrant an appellate court in interfering with the verdict. The judgment is affirmed.

HOYT, C. J., and DUNBAR and GORDON, JJ., concur.

STATE v. McCANN. 271

OPINION ON RE-HEARING.

SCOTT, C. J.—On December 22d last an opinion was rendered by us whereby the judgment of conviction had in this case in the lower court was affirmed. (47 Pac. 443). Thereafter a petition for a re-hearing was filed, to which the court directed an answer by the state, and a re-hearing was subsequently granted and the cause assigned for argument at the last term. Upon such reargument and further consideration of the case, a majority of the court have come to the conclusion that the former decision ought not to stand.

It will not be necessary to reconsider the entire case, as we are satisfied with the views indicated in the former opinion, in the discussion of most of the questions, and a number of them will not be likely to arise upon a retrial of the cause. Some will be eliminated in consequence of the acquittal of Michael Mc-Cann. We have been led to grant a retrial upon the further consideration of the case as to one question only, and that is the instruction set forth given by the court to the jury upon the subject of self-defense, wherein the court charged the jury that :

"To justify the taking of life in self-defense, it must "appear from the evidence that the defendant or de-"fendants not only really and in good faith endeavored "to decline any further struggle, and to escape from "their assailant before the fatal shot was fired," etc.

The objectionable part of this instruction is the clause wherein the court told the jury that it was incumbent upon the defendants to endeavor to escape from the deceased. We were not entirely satisfied with this instruction upon the former hearing. It must be conceded that the meaning which would ordinarily be attached to the word, "escape," as here

used, would be to "get away," to "flee," and in that sense we were of the opinion that it would have been erroneous, but we were also of the opinion that it had not been excepted to upon that ground, and that from what did appear relating to the exception taken thereto and of its having been followed by the two other instructions set forth, mentioning the matter of withdrawing, etc., it was probable that it was not understood in the sense that the defendants were called upon to run away when the deceased appeared with the rifle. Upon further consideration of the question, a majority of the court have come to the conclusion, in considering the exceptions which were taken to the instructions requested by the defendants and which were refused by the court, as well as the exceptions to the instructions which were given upon this phase of the case, that said instruction should be deemed excepted to in the particular mentioned, and as the jury may have understood therefrom that it was incumbent upon the defendants to flee when Cicero appeared with the gun it may have been prejudicial to them.

We desire to add a word, also, with respect to another feature of the case, and that was the request for an instruction with reference to the guilt of James McCann. We can see no reason why more particular instructions should not have been given upon this subject, as requested, although we found no error in the premises, considering the instructions that were given thereon. Where instructions requested are pertinent and clear, it is desirable that they should be given rather than to have others of a more general nature substituted by the court.

Reversed and remanded for a new trial.

ANDERS and REAVIS, JJ., concur.