282 P.2d 323

**STATE of Utah, Plaintiff and Respondent,**

v.

**Paul Buddy ST. CLAIR, Defendant and Appellant.**

No. 8166.

Supreme Court of Utah.

April 12, 1955.

232

Defendant was found guilty of murder in the first degree. No recommendation of leniency, as permitted by statute, was made by the jury and he now awaits the outcome of this appeal under sentence of death in the Utah State Prison.

It is not questioned that the defendant Paul Buddy St. Clair shot and killed Vesta Wittke on July 6, 1953. The issue at the trial was as to the gravity of the crime. The state's proof was to the effect that the killing was wilful, deliberate and premeditated. The defendant contended, and his evidence was purposed to show, that the shooting was done in a quarrel and in the heat of passion.

On this appeal defendant argues that, even if it be conceded that the state's evidence was sufficient to warrant his conviction of first-degree murder, the death sentence he received resulted because of improper adverse rulings and the admission of incompetent evidence, prejudicial to him, and that in the absence of such irregularities the jury would have convicted him of a lesser degree of homicide, or at least would have recommended leniency and thus saved his life.

St. Clair had been a boarder at the home of Mrs. Wittke, a widow, up to a few months before the crime. They had "kept company" together; there was some evidence of a love affair and perhaps a meretricious relationship between them. Three

Sidney G. Baucom, Clair G. Andersen, Salt Lake City, for appellant.

E. R. Callister, Atty. Gen., John W. Horsley, Salt Lake City, for respondent.

CROCKETT, Justice.

days before her death, in the early morning of July 3, they had quarreled and there had been some physical altercation. She had called her grown son, Dayton, in on the affray and he held St. Clair while she beat him over the head with a poker. The sheriff was called; he took St. Clair to the Tooele Hospital for medical attention. On the way he told the sheriff, "I'll get that little s—— o—— b—— Dayton and there'll be a payday for Vesta [deceased] too."

The evidence shows without question that St. Clair was quite badly injured. He had several bruises and lacerations on his head, including a gash which required 11 stitches to close. He borrowed a pistol; and on the night of July 6, about 1:30 a. m., came to the Wittke home. As to what happened at that time there is conflict. The state's version, based on the dying declaration of Vesta Wittke, and corroborated by her 15 year old daughter, Pat, who was in bed with her mother at the time, is in substance: That defendant came to the Wittke home and, without knocking or asking to enter, went into the bedroom where Mrs. Wittke and her daughter were in bed, switched on the light, said, "Vesta, this is payday" and immediately fired two shots into her body.

St. Clair's story was that he went to the Wittke home in response to a telephone call from the deceased; that he entered through the back door, looked for Vesta in the kitchen, and then went to the bedroom; that he switched on the light; she said,

"I see you finally arrived"; that she then informed him that she wanted him to forget about the beating she had given him. He responded that he was through and wouldn't have anything more to do with her. He further said that she mentioned being short of money; that he reminded her of money she owed him and that it would cost her an additional $15 to pay for sewing up the cut on the head she gave him; and further that upon being asked if he was going to come back he said, "No Vesta, I think this is payday for us. I think we are settled," to which she replied, "I don't owe you a thing, Paul, you have been completely paid up—don't you remember?" He stated that from her statement he understood that he had been buying her affections; that he must have gone "crazy mad"; and that he remembered nothing until he found himself sitting on the edge of a chair, the grievously wounded Vesta lying on the bed, her son Dayton standing over him, and the gun he had borrowed lying on the bed.

The defendant contends that a statement made by Vesta after she was shot was improperly admitted in evidence. Bruce Sagers, a neighbor, was allowed to testify over objection that shortly after the shooting the deceased said to him:

"Bruce, before I pass out I would like you to know what Paul said to me. He came in, flashed on the light and said, 'Vesta this is payday,' and began firing at me."

Defendant urges that this statement being hearsay, no proper foundation was laid for

its admission as an exception under the dying declaration rule because the deceased did not have the required state of mind. He avers that the words "before I pass out" indicate only an opinion that she was going to lose consciousness; that the evidence does not show that she "knew" of impending death and further that a "mere belief" that one is going to die is not sufficient, quoting the cases of People v. Hodgdon[1] and Smith v. Commonwealth[2] to that effect.

■ It is true that some authorities have made a distinction between "belief" and "knowledge," requiring that the deceased must appear to have known for a certainty that she was going to die. Such a distinction seems impractical. We are in accord with the proposition that the belief must be more than a mere possibility or probability of death, but to require absolute knowledge would impose too rigid a test. In one sense it may be said that one could never have knowledge of an event to take place in future, but at most could only entertain a belief that the event will come to pass. The trial court should not be required to distinguish between knowledge and undoubting belief, a hair which can scarcely be split. The guarantee of trustworthiness which justifies admission of dying declarations finds its foundation in the idea that the approach of death induces a state of mind in the declarant free from any worldly motives to falsify and a fear of the consequences of deception.[3] The same warrant of truthfulness would exist in the absence of absolute knowledge if the declarant believed death to be near at hand. The true test should be whether the declarant at the time of the declaration so fully expected to die from an existing affliction that he had in fact abandoned all hope of recovery.

■ It is for the trial court to determine the admissibility of such evidence under the foregoing rule, which should not " 'depend upon any particular forms of expression, * * * but * * * upon the view which the deceased took of his own case when in imminent danger of death.' "[4] The circumstances of each case will show whether the requisite consciousness existed, and the trial court should be given considerable latitude in making such determination.[5]

■ In the instant case the evidence warranted a finding that the deceased appreciated the fatal nature of her wounds and that she was going to die. She had been shot twice and had bled profusely. The examining physician testified that "she was certainly very critical," was in "severe shock" and in danger of dying at any time.

1. 55 Cal. 72, 36 Am.Rep. 30.

2. 113 Ky. 19, 67 S.W. 32, 23 Ky.Law Rep. 227.

3. 5 Wigmore on Evidence (3rd Ed.) 230–32.

4. State v. McNair, 53 Utah 99, 178 P. 48, 52, quoting Commonwealth v. Roberts, 108 Mass. 296.

5. 5 Wigmore on Evidence (3rd Ed.) 238.

Deceased told her daughter Pat "* * * not to go to pieces, that I had to take care of Don [a nine year old brother]; and she told me to kiss her and she said good-bye." Under those circumstances the trial court could reasonably conclude that the declarant had abandoned hope of recovery and admit the declaration.

■ It is not to be questioned that the State's case, based upon the dying declaration of the deceased, corroborated by the testimony of her daughter and other evidence, is a reasonable and credible account of what happened, and amply supports the charge that this was a wilful and deliberate killing justifying the first-degree murder verdict. The only extenuating circumstance is the fact that the deceased and her son had given the defendant such a severe beating that he remained in a state of outrage and possibly with a determination for revenge. On the other hand, the defendant appears to have been a most inept witness as to some aspects of his testimony. His story as to the purpose of going to the Wittke home and the happenings there at 1:30 in the morning would test the credulity of the most naive. However adversely one may react toward the defendant and his conduct, which was admittedly both reprehensible and indefensible, he is still entitled to such protections as the even-handed administration of justice under the law affords, keeping in mind that the proper objective is the speedy, sure and effective administration of justice, and that reversals for merely specious or technical defects or irregularities should be avoided. Yet in the pursuit of that objective, the rights of individuals to have a full, fair and impartial consideration of all essential aspects of their cases must not be sacrificed.

■ The matter of critical importance in this case is that, upon conviction of murder in the first degree, the jury is given the prerogative of recommending leniency, which is almost invariably followed by the court, resulting in a sentence of life imprisonment instead of the death penalty. The giving or withholding of such recommendation is peculiarly within the prerogative of the jury. They are not restricted to any particular rule of law or limitation upon evidence, and are entitled to take into consideration anything they conscientiously believe should be weighed in giving or withholding such recommendation.[6]

■ Notwithstanding the fact that the dying declaration referred to was properly admitted in evidence, there are certain other aspects of the proceedings which merit our attention in considering the defendant's charge that he did not have a fair trial. Some of these were properly assigned as error and presented to this Court, and some not. While we will not ordinarily raise questions of error on our own motion, under the decisions of this Court it is well established that in capital cases when

6. See State v. Mewhinney, 43 Utah 135, 134 P. 632, L.R.A.1916D, 590.

the interests of justice so require the entire proceeding should be reviewed to determine whether errors occurred as a consequence of which the accused did not have a fair trial, even though not assigned and argued.[7]

In order properly to appraise this proceeding for the purpose just stated it is necessary to keep in mind that it took place in a comparatively small community where everyone is not only pretty much aware of what goes on, but also participates to some degree in the inflamed passions which naturally would be inspired by the killing of a widow and mother, leaving minor children. Defendant was a man without family and without any friends who would provide assistance in his defense. The court appointed counsel who sensed the atmosphere as one of tension and prejudice. Before the trial was set, he made a motion for change of venue on the ground that a fair trial could not be had in Tooele. The court denied the motion but assured him that the matter would be given further consideration by exercising caution in the selection of a jury and then determining whether an impartial jury could be impaneled.

At the time of trial prospective jurymen affirmed that the incident had been discussed all over town, which the court echoed:

"It has been discussed all over town, I think that I can take that for granted."

This fact would not, of course, mean that defendant could not have a fair trial in Tooele. But it is part of the background upon which we analyze the further proceedings. In urging that a fair trial could not be had there, defendant's counsel said:

"It seems everyone was anxious to be on the jury; they waived exemptions, whereas those that have exemptions ordinarily would have claimed them. * * *" and further, "* * * We call attention especially to Mrs. Pickett * * * she said she wasn't prejudiced but did believe in justice, and your Honor will remember the emphasis on 'justice.' And by justice we thought she meant he be given the extreme penalty in this case."

It is pertinent to note the singular remark of the trial judge in response to this statement of counsel. He said, "The jurors themselves can avert that extreme penalty, they can recommend leniency." This suggests a preconceived conclusion in the mind of the judge himself that the defendant was guilty of first-degree murder and that his only hope was for a recommendation of leniency. Perhaps what the judge thought about defendant's guilt would have been immaterial because the jury, not he, were to determine the matter, had it not been that this foregone conclusion that all that was required was the perfunctory formality of a trial seems to have carried

7. State v. Stenbeck, 78 Utah 350, 2 P.2d 1050, 79 A.L.R. 878; State v. Russell, 106 Utah 116, 145 P.2d 1003, 1007; State v. Matteri, Utah, 225 P.2d 325, 330.

over in the judge's attitude toward defendant's cause in making other rulings in the proceedings, as will hereinafter appear.

■ The court was not disposed to be indulgent to the defense in regard to rulings on evidence. Some of the most damaging testimony against St. Clair was given by deceased's daughter, Pat Wittke. Defendant's counsel attempted to show bias on the part of the witness by asking on cross-examination:

"Q. You didn't approve of Mr. St. Clair staying with you in the home, did you Pat?

"Mr. Anderson: Objection.

"Mr. Hansen: I think it would go to any bias.

"The Court: Well the objection is sustained."

It is basic that any evidence tending to show ill feelings, antagonism or animosity of the witness toward the defendant is admissible as bearing upon credibility.[8]

The court also sustained objections curtailing examination of this witness concerning defendant's associations with the Wittke family in going on hunting trips and the use of guns with her two younger brothers; and likewise excluded proffered defense testimony as to the nature and extent of his earlier acquaintanceship and association with the deceased, all of which bore upon the relationship which had existed between St. Clair and Mrs. Wittke and her family.

■ None of the rulings on evidence, considered singly, may seem of any great import. But the defendant is nevertheless entitled to have them considered cumulatively and as part of the over-all picture in determining whether he had a fair opportunity to present his defense.

There is another matter relating to the evidence which is of more importance. It concerns the fact that a witness for the state, Sheriff Fay Gillette of Tooele County, testified to certain statements the deceased made to him before the fatal incident occurred. The testimony came out in this manner:

"Q. Did you see Vesta Wittke between the 3rd and the 6th? A. I did.

"Q. Where did you see her? A. I saw her once down town, and was called at least three times at the office by her, and she visited my home the night of the 5th, the night of July 5th. [The night of the killing.]

"Q. And why did she call you? A. She was worried, worried about her welfare and her children's welfare.

"Q. Why was she worried?

"Mr. Hansen: I object to it, it is immaterial what she told the sheriff. I move to strike the conversation.

"The Court: The motion is denied."

8. People v. DeMello, 28 Cal.App.2d 281, 82 P.2d 457; People v. Payton, 36 Cal.App. 2d 41, 96 P.2d 991; State v. McCann, 16 Wash. 249, 47 P. 443, on rehearing 16 Wash. 249, 49 P. 216; 3 Wharton, Criminal Evidence (11th Ed.) p. 226.

The sheriff then proceeded to testify that Mrs. Wittke told him of several threats St. Clair had made to her by telephone, after which this occurred:

"Mr. Hansen: I would like to make another motion that this answer be stricken, it is made by a declaration of the witness and not subject to cross examination, and if this was a dying declaration it was long before the shooting.

"Mr. Anderson: We will join in the motion; it may go out.

"Mr. Hansen: You also join in the other one?

"Mr. Anderson: We join in the other one, the last two answers may go out."

The court said nothing in response to defense counsel's motion to strike. Nor did the court in any manner inform the jury that the evidence was stricken from the record or that it should not be considered by them; and, at the close of the evidence the trial judge refused a request that he give an instruction directing the jury to disregard such evidence.

▇▇▇▇ It is true that defendant's counsel (different from those representing him on this appeal) made the wrong objection, i. e., that the evidence was immaterial, instead of the correct one, that it was incompetent. But after the evidence was in, it undoubtedly would have lessened the possibility of harmful effect if the trial court

had told the jury that they should disregard it, as was his duty.[9] It is difficult to see what competent evidence could have been brought forth from the sheriff by the question "Why was she worried?" It could only have elicited a conclusion on the part of the sheriff as the reason for her state of mind, or some such hearsay statement as was made. Neither would have been competent. Further, her state of mind was not in issue and was therefore immaterial. The testimony was purposed to show defendant's intent to kill because he made threats, reported by a witness who did not hear the threats made, but only heard someone else say that defendant made them.

The State makes no contention that such evidence was proper, but avers that it was not prejudicial to the defendant because of the District's Attorney's agreement that it could be stricken from the record; and further, that because of other evidence the defendant's guilt was so patent and clear that no other verdict was possible.

In urging that the District Attorney's action in joining in the motion to strike would be understood by the jury to mean that the evidence was to be stricken from the record and disregarded by them, our attention is called to Instruction No. 13, which read:

"You should not consider, or be influenced by, any evidence offered but not admitted, nor any evidence stricken

9. Sanders v. People, 109 Colo. 243, 125 P.2d 154.

out by the court, but only such evidence as has been admitted in the case. You should not consider, or be influenced by any statement of counsel as to what the evidence is, unless they state it correctly, or by any statement of counsel of facts not shown in evidence. * * *"

 This instruction might well be interpreted by the jury to mean just opposite to what the State contends. The fact is that the evidence *was admitted,* and *was not stricken out by the court.* Significant is the part of the instruction which says that they should not "consider or be influenced by any *statement of counsel,* as to what the evidence is". It was not the prerogative of counsel, but the exclusive responsibility of the court to instruct the jury. Jurors are persons of ordinary intelligence—often of a higher degree than courts and lawyers give them credit. They are properly always directed, as they were here, that they must follow the instructions of the court as to what the law is, regardless of what they personally believe it is, or ought to be. Conscientious jurors are usually anxious to abide by the directions and desires of the court, so far as made known to them, and sometimes do so even against what might seem to them to be common sense. This is particularly true in a county such at Tooele, where jury trials are somewhat rare, and trials for first-degree murder even more so. In the absence of any indication from the court that the evidence should be disregarded there is a definite possibility that the jury might, from a literal application of the instruction, have thought that they should consider the evidence. At least it cannot be assumed with certainty that they realized that they were not to give attention to it.

Prior threats made by the defendant would undoubtedly have been regarded by the jury as an aggravating circumstance to which they would give serious consideration, not only as detracting from the credit to be given defendant's version of the shooting, which he claims resulted from a flare-up in an immediate quarrel, but as to the extent of premeditation or deliberation which took place, and also upon any element of provocation given him, which might in any measure justify or explain his violent and irrational conduct.

In attempting to evaluate the effect which the telephone conversations related by the sheriff may have had on the trial, it is of importance to note that in proof of premeditation the state presented two distinct types of evidence, sharply contrasted in character—first, the statements made by St. Clair himself to Sheriff Gillette on the night three days before the killing, when he was beaten up; and second, the sheriff's hearsay statement as to telephone conversations with the deceased. For convenience and clarity we refer to the first as the "beating threat" and to the second as the "hearsay threats."

This question is posed: Suppose a jury judged the case with only the evidence of

the "beating threat," as compared to judging it with both the "beating threat" and the "hearsay threats." Can it be said that the result would unquestionably have been the same?

The "beating threat" was made while the defendant was smarting from and outraged by blows with a poker at the hands of the deceased and her son. It must have been very severe from the physician's description of the bruises and lacerations upon the head and suturing which was required. Dr. Jack Tedrow examined the defendant on October 14, three months after the beating, and testified that even at that late date he found a large lump over the vertex of the skull. The doctor's further diagnosis was: "From the intellectual standpoint such a beating could result in poor ability to concentrate, a poor memory, and poor judgment. From the emotional standpoint it could result in hyperirritability so the person doesn't have the emotional control he ordinarily has."

If the threat made immediately following the beating were the only one in evidence, the jury might well have had some degree of understanding for such a reaction on the part of the defendant, regarded it as hardly surprising that he was provoked to some wild talk and threats of violent retribution, and believed it not necessarily inconsistent with his claim that three days later he went to the Wittke home in a calm mood in response to a phone call.

On the other hand, the "hearsay threats" had no such ameliorating characteristic. These threats, supposedly made in telephone conversations with the deceased, who relayed them to the sheriff, who in turn brought them before the court, if made, would have been uttered after a substantial cooling off period, and closer to the time of the killing. This would weigh directly against defendant's claim of a shooting while angered in a quarrel, and would pointedly support the State's claim of a planned and deliberate murder. There was already sufficient evidence of premeditation and deliberation for the case to go to the jury on first-degree murder. The only purpose the "hearsay threats" could serve would have been to aggravate the nature of the crime, outrage the sensibilities of the jurors and increase animus toward the defendant.

There is another aspect of this evidence which merits attention. This court has previously indicated that irregularities in trial are more likely to be considered prejudicial where improper questions deliberately asked by the prosecution elicited harmful information. In State v. Hartman,[10] it was held that hearsay testimony given by the State's witness was not prejudicial error where the trial judge had done all that he could to rectify the matter, having admonished the jury to disregard the statement and instructed the jurors that they could consider the bias of the

10. 101 Utah 298, 119 P.2d 112, 113.

witness, but in considerating the objectionable testimony this court said:

"The *question* was not subject to objection. The last part of the answer * * * was a voluntary statement which was not responsive and should not have been made. But there is nothing in the record to show that the interrogator intended to elicit this statement. *Were it shown to be an attempt to get in evidence the prejudicial reference* to another crime, such purpose might well have moved the court to declare a mistrial not only on the ground of prejudice but as a proper expression of * * * disapproval * * *."

We recognize that during the fast moving scenes of criminal trials it is extremely difficult for counsel and the court to avoid the pitfalls of improper examination and rulings. Nevertheless it is the responsibility of the State to see that an accused has a fair trial. Where the error interferes with that purpose, and deliberate action by the State is the cause of such interference, we should be more hesitant to hold such error harmless. The fact that the objectionable testimony was elicited as indicated is, of course, not controlling; nor should the rights of litigants be determined on the basis of censure to the court or counsel, but these matters are facets of the entire situation to be considered in determining whether a new trial should be granted.

Also to be weighed is the fact that the testimony referred to was given by a witness whose testimony would have a more than ordinary influence with the jury. While it is not ordinarily our prerogative to judge the credibility of witnesses, it is not beyond the scope of proper inquiry to take notice of the fact that the sheriff who made the statement is an individual respected enough to have been elected to the position of sheriff which stands for law and order in the community. It is quite likely that the jury would have given more than usual weight to his testimony, including the incompetent matter, without realizing that the sheriff did not, and could not, vouch for the truth of what deceased told him concerning her troubles with the defendant.

Another phase of the trial which causes apprehension is that although defense counsel made no unreasonable request for time to argue to the jury, the court announced, "The argument will be limited to 40 minutes." The question arises whether this short limitation infringes the right of the defendant to appear and defend in person and by counsel assured by our constitution[11] and statutes.[12] In some states appellate courts have held under provisions similar to ours that there should be no time limitation on

---

11. Art. I, § 12, Utah Constitution.

12. § 77–1–8, U.C.A.1953.

242

arguments in capital cases.[13] It has sometimes been suggested that such ought to be the rule in Utah, particularly because of the wording of our statute, Section 77–31–3, U.C.A.1953:

> "If the * * * offense [is] punishable with death, two of counsel on each side may argue the cause to the jury. If it is for any other offense the court may, in its discretion, restrict the argument to one of counsel on each side."

It is argued that because the statute expressly authorizes the court to restrict the arguments in other cases, but not in capital cases, the legislature intended that there be no such limitation. With this contention we do not agree. Our view is that it is within the inherent power of the court to reasonably limit time for arguments of counsel, even in capital cases, and this is supported by sound authority.[14] Yet it cannot be doubted that the wording of our statutes does reflect an intent that, when the offense is punishable by death, the court should be more indulgent to the end that counsel for the accused have sufficient time to discuss fully the evidence in the light of the law as outlined by the court in its instructions. The time required will depend somewhat upon the circumstances of each case: the number of witnesses, the amount and nature of the testimony, contradictions in the evidence, and the complexities of the issues involved.

▮ Failure of the court to allow sufficient time for argument to accomplish the above purpose is prejudicial error. In State v. Ballenger,[15] a murder case, it was held that a limit of one hour to argue the case for the defense was a violation of the accused's right to be heard through counsel. Similarly in State v. Cash [16] the court was of the opinion that one hour was not sufficient for that purpose and such limitation was reversible error. In the case of State v. Mayo [17] in holding that one and one-half hours was too short and prejudicial error the court aptly stated the basis of its holding:

> "To appear and defend in person and by counsel is a right guaranteed to one accused of crime by the Constitution of this state, * * * a

13. State v. Tighe, 27 Mont. 327, 71 P. 3; Jenkins v. State, 60 Tex.Cr. 236, 131 S.W. 542. See also Williams v. State, 60 Ga. 367, 27 Am.Rep. 412.

14. See 23 C.J.S., Criminal Law, § 1084, pp. 524, 525 and cases there listed.

15. See 202 S.C. 155, 24 S.E.2d 175 (22 witnesses).

16. 138 S.C. 167, 136 S.E. 222 (25 witnesses).

17. 42 Wash. 540, 85 P. 251, 254, 7 Ann. Cas. 881 (20 witnesses). See also People v. Fernandez, 4 Cal.App. 314, 87 P. 1112; Childers v. Commonwealth, 161 Ky. 440, 171 S.W. 149; People v. McMullen, 300 Ill. 383, 133 N.E. 328; Fugate v. Commonwealth, 254 Ky. 663, 72 S.W.2d 47; York v. U. S., 6 Cir., 299 F. 778.

part of that right is the right to address the jury * * *. This right, too, has always been regarded as one of the greatest value, not only to the accused, but to the due administration of justice, and any limitation of it which has seemed to deprive the accused of a full and fair hearing has generally been held error entitling the defendant to a new trial. (Citing cases.)"

In the case at bar nine witnesses were called on behalf of the State and seven for the defendant, a total of sixteen. The State's theory of the killing was in direct conflict with that claimed by the accused. The forty minutes allowed for argument would give less than three minutes per witness for discussion of the testimony, without allowing any time for the necessary generalities in opening and closing and presenting the over-all application of the theory of the defense and the conclusions to be drawn therefrom. It would have been a very short time in which to expect even the most competent and experienced advocate, let alone the admittedly young and inexperienced counsel representing the defendant, to present arguments in the case adequately. The unreasonableness of this restriction is accented when it is realized that the outcome was to cast the die of fate for the whole of eternity for the defendant. Expedition in trials is to be

commended, yet it should not be allowed to sacrifice thoroughness, nor a full and careful coverage of every essential part of the proceeding. Whether the limitation here imposed amounted to such a deprivation of the defendant's constitutional rights to appear and defend by counsel as to justify reversal need not here be decided. The restriction at least bordered upon the unreasonable and arbitrary to the extent that there is grave doubt that St. Clair was accorded his legal rights.

The proposition for us to decide here is not whether any of the irregularities herein discussed would separately have been such as to constitute prejudicial error and require a new trial. It is recognized that a combination of errors which, when singly considered might be thought insufficient to warrant a reversal, might in their cumulative effect do so.[18] This is particularly so where any difference in the verdict, even a recommendation of leniency, would make the difference between life and death to the accused. Under such circumstances it is our duty to scrutinize with care the propriety of all aspects of the proceedings. It is not the easiest thing in the world to gauge what effect error may have had upon a trial. The only thing a reviewing court can do is to survey the circumstances and theorize as to what the verdict would have been had the accused been tried on competent evidence only, uncolored by the

18. State v. Vasquez, 101 Utah 444, 121 P.2d 903, 140 A.L.R. 755; see State v. Moore, 111 Utah 458, 183 P.2d 973.

"hearsay threats," and in the absence of the other improprieties related herein. On the basis of such appraisal, if the court can say with assurance that the evidence of the defendant's guilt was so clear and convincing that no reasonable jury could be expected to return a different verdict, even in the absence of the irregularities, then the errors would be harmless and the verdict should be permitted to stand. On the other hand, if there is a reasonable likelihood that in the absence of the errors a different verdict might have been rendered, a new trial should be granted.

We have given due consideration to the various irregularities hereinabove discussed: The adverse rulings on evidence; the introduction of hearsay testimony of threats; the fact that such evidence was elicited deliberately by the prosecution and that no effort was made by the trial court to cure the error; and to the very brief limitation of time for argument. We have weighed their probable effect upon the result in the light of the further circumstance that notwithstanding the severe beating defendant had suffered in a fight with deceased three days before the shooting, the extreme penalty was assessed against him. Under such circumstances, we cannot affirm with confidence that the result would have been the same in the absence of the irregularities mentioned. We are, therefore, impelled to the conclusion that there is substantial doubt that the defendant was properly convicted, which doubt should be resolved in his favor, so that we are conscientiously bound to grant a new trial.

It is so ordered.

WADE, J., concurs.

HENRIOD and WORTHEN, JJ., concur in the result.

McDONOUGH, C. J., dissents.