301 P.2d 752

**STATE of Utah, Plaintiff and Respondent,**

v.

**Paul Buddy ST. CLAIR, Defendant and Appellant.**

No. 8489.

Supreme Court of Utah.

Oct. 1, 1956.

Clayton L. Simmons, John C. Beaslin, Salt Lake City, for appellant.

E. R. Callister, Atty. Gen., Walter L. Budge, Asst. Atty. Gen., for respondent.

WADE, Justice.

Defendant, Paul Buddy St. Clair, is accused of first degree murder of Vesta Wittke. He has had two trials and the jury in each has found him guilty of that crime without recommending leniency, thus requiring the death sentence. For a more detailed statement of the facts and evidence and for our previous decision see State v. St. Clair.[1] Between each trial and the appeal therefrom defendant has had a different set of lawyers each with different ideas on how the trial should be conducted. The lawyers conducting the appeal have carefully studied the record and now urge error in the trial court's rulings made without any objection and in some instances with the express or implied consent of defendant's counsel at the trial. Since this is a murder case we have carefully studied the record even though the rulings complained of were made without objection but we have failed to find any prejudicial error.

1. Defendant first contends that the court's instructions failed to clearly distinguish between first and second degree murder as required in the cases of State v. Russell, State v. Thompson and State v. Trujillo.[2] The argument on this question is largely technical based on the construction of certain terms used, it criticizes the statement that certain elements are not included in second degree murder claiming that this would tend to cause confusion. We conclude that the instructions when all of them are considered together clearly make the required distinction between first and second degree murder in accordance with the holdings of the above cited cases.

2. Defendant's second contention is that the admission in evidence of the pocket knife taken from him when he was arrested after the shooting and a piece of the back-door screen, with a cut, through which the back screen door could have been unlatched, was prejudicial error. He claims that, in view of the F.B.I. report that it is impossible to associate by tool marking comparisons the knife as the tool used to cut the screen, these exhibits have no tendency to establish the guilt of the accused but could serve only to prejudice or mislead the jury. Defendant further contends that the admission of these exhibits with the statement by the court just before the F.B.I. report was read "that you would hardly expect the harder blade of a knife to leave part of its metal on soft copper wire. I would think you

1. State v. St. Clair, 3 Utah 2d 230, 282 P. 2d 323.

2. State v. Russell, 106 Utah 116, 145 P.2d 1003; State v. Thompson, 110 Utah 113, 170 P.2d 153; State v. Trujillo, 117 Utah 237, 214 P.2d 626.

would look for the soft metal on the hard metal," was prejudicial to defendant's cause.

The killing occurred in the early morning between 1:00 and 1:30 o'clock on July 6, 1953. Defendant and decedent had been good friends, he had boarded at her home up to Thanksgiving time of the year before and they frequently went out together. The last time was on the evening of July 3, 1953, when a quarrel occurred and she beat him over the head with a steel coal stove poker while her grown-up son Dayton held him. There was medical testimony that this beating might have caused brain concussion which would result in super-irritability. Defendant testified that he went to decedent's home on the morning of the 6th on her invitation by telephone the night before, that he entered the house through the back screen door which was unlatched, but Dayton and Patricia, decedent's two grown children who were in the house at the time each testified that the back screen door was latched when they went to bed the night before and that the wire screen in that door was not cut as shown in the exhibit and that the screen door could not be opened from the outside without making such cut in the screen. Dayton, Patricia and the sheriff each testified that shortly after the shooting early in the morning of the 6th, they noticed that the screen door had been cut as shown in the exhibit. This tends to refute defendant's claim that he came there on the invitation of the deceased and to indicate that he deliberately broke into the home in order to shoot her. At the time when these witnesses claim to have noticed the cut in the screen there would be no occasion to cut the screen in order to refute his testimony of being invited to the home because no one then had any idea what his testimony would be.

The part of the screen exhibit shows that most of the cut wires are turned toward the outside rather than toward the inside of the house. From this defendant argues that the screen must have been cut from the inside of the house. However, there are places, notably for about a half inch at the very top of the long cut, where the ends of the cut wires turn inwardly. This suggests that the knife blade was thrust from the outside through the screen then drawn outwardly in making the cuts both ways from that point. We further note that the F.B.I. report does not say that this cut was not made by this knife, it merely says that no markings of metal on the knife or the wires of the screen indicate that the cut was made by this knife. If metal from the knife had been found on the screen or metal from the screen had been found on the knife, it would strongly indicate that the cut in the screen was made by this knife, but there is nothing

346

in the evidence which indicates that the failure to find such markings is a definite indication that the cut was not made by this knife. For it may well be that such a cut could have been made without leaving any such markings either on the knife or the screen.

In view of the above observations these exhibits were admissible in evidence for they tend to show that defendant broke into the home rather than that he came in through an unlocked door by special invitation, although the F.B.I. report and the way the wires near the cut were bent form a basis of an argument to the jury in defendant's favor and somewhat weakened the state's contention. As to the comment of the judge we are unable to see how it could have been prejudicial to defendant for the statement made had no bearing on any issue in the case.

3. The third contention that defendant was prejudiced by the court's suggestion that it was immaterial what certain words which the defendant said to the sheriff on the evening of July 3, meant to him, seems obviously without merit. The sheriff testified that on that evening while driving the defendant to town after he had been beaten by the deceased, defendant said "he was going to get even with that little s. o. b. Dayton and there would be a pay day for Vesta." On cross examination defense counsel asked the sheriff whether, at the time, he considered these words as threats and the answer was that "he was angry and hurt, apparently hurt and intoxicated, so I figured that maybe they would ease up later on." On the further question "what did you take these words to mean?" the court wondered "if that would help the jury" and defendant's counsel withdrew the question.

Obviously what the sheriff took these words to mean was immaterial, and the answer might have been unfavorable to the defendant. The sheriff had already explained about all he could on that subject. The question did not call for surrounding circumstances or background but for what the words meant to him. This question called for the sheriff's conclusion and opinion of what these words meant to him at the time they were spoken; there is nothing to indicate that the sheriff knew any more about the meaning of those words than would be evident to the jury from his testimony, and the court was right in making the suggestion that the answer to that would not help the jury and the defendant's attorney was correct in immediately withdrawing the question.

4. The last contention of the defendant is that the evidence is not sufficient to support the verdict of first degree

murder. The defendant makes no claim that he did not shoot and kill the deceased, the only question is whether the killing was cool and deliberately planned. The undisputed evidence shows that he went to deceased's home between 1:00 and 1:30 o'clock in the morning when all the lights were off and the inhabitants were asleep, taking with him a gun which was loaded and ready for use; that he awakened the deceased by flashing the lights on and after a very short conversation he fired three shots at her at close range. These facts point definitely to a cool and deliberately planned killing, and the fact that deceased had struck him over the head two days before with a poker does not necessarily require a verdict of less than first degree murder. There is some dispute as to details, and if all of defendant's evidence is true, a lesser verdict would be justified, but his testimony was notoriously weak and inconsistent and such that the jury could reasonably not believe. The jury evidently did not believe defendant's evidence which indicated a lesser crime. This was a jury question, and even if we might be inclined to do so, we cannot disturb their decision.

Judgment affirmed.

McDONOUGH, C. J., and CROCKETT, HENRIOD and WORTHEN, JJ., concur.